[No. C042328. Third Dist. Oct. 29, 2004.]

THOUSAND TRAILS, INC., et al., Plaintiffs and Appellants, v. CALIFORNIA RECLAMATION DISTRICT NUMBER 17, Defendant and Respondent.

**COUNSEL**

Buchalter, Nemer, Fields & Younger, Bernard E. LeSage and Clinton D. Wilburn for Plaintiffs and Appellants.

Longyear, O'Dea & Lavra, Gregory P. O'Dea, Andrea J. McNeil and Kelley S. Kern for Defendant and Respondent.

OPINION

**RAYE, J.**—In an effort to divert raging floodwaters during torrential rains in January 1997, defendant California Reclamation District Number 17 (District 17) decided to cut a levee to the south of Turtle Beach campground (campground), owned by plaintiff Thousand Trails, Inc., and National American Corporation (Trails). To cut the levee, District 17 commandeered a bulldozer operated by an employee of Brown Sand, Inc. (Brown Sand). Unfortunately, the resulting levee cuts released floodwater and further inundated the campground.

Trails filed suit against District 17, alleging strict liability, inverse condemnation, negligence, dangerous and defective condition, trespass, and nuisance. Subsequently, Trails requested permission to file a third amended complaint; the trial court denied the request. District 17 brought two motions for summary judgment, arguing it was immune under the police power exception to inverse condemnation liability and asserting immunity under the Government Code.[1] The trial court granted both motions. Trails appeals, contending the court erred in granting summary judgment since immunity does not apply and in denying its motion for leave to amend its complaint.[2] We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The campground is located on the San Joaquin River between two levees. It lies to the east of the river, to the west and south of levees maintained by District 17, and to the north of levees maintained by Reclamation Districts Number 2096 (District 2096), Number 2075 (District 2075), and Number 2064 (District 2064). In essence, the campground is located on the river side of the levees. Much of the campground was under water prior to January 1997.

District 17 is a reclamation district responsible for the maintenance and operation of levees and other improvements that protect portions of San Joaquin County (County). District 17's board of trustees during the pertinent period included Henry Long, chairman; Albert Muller; and Monte McFall.

As a result of upgrades completed in 1989, District 17's levees provide the property within District 17 with a 100-year level of flood protection, a

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

[2] This is the second appeal involving this dispute before this court. Previously, in a nonpublished opinion, we affirmed summary judgment in favor of Brown Sand. (*Thousand Trails, Inc. v. Brown Sand, Inc.* (Feb. 6, 2004, C040869).)

standard established by the Federal Emergency Management Agency (FEMA). The levees were certified as compliant with FEMA's 100-year standard.

The State Reclamation Board inspects the levees twice annually. District 17's levees conformed to maintenance standards in each of the eight years preceding the 1997 flood.

*The Flood*

Heavy rains pelted the area in late December 1996 and early January 1997. On January 2, 1997, Governor Wilson declared a state of emergency, as did the County. Many levee breaks occurred along the San Joaquin River and its tributaries, causing massive flooding throughout the County.

District 17's trustees, as well as the County, began to conduct patrols of District 17's levee system in late December. Eventually, District 17 began to monitor the levees hourly.

On January 5, 1997, two levee breaks caused the flooding of District 2064, south of the campground. A cross-levee in District 2075 prevented the water from flooding Districts 2075, 2094, and 2096. A relief cut at the low end of District 2064 channeled the floodwaters back into the river. The cut prevented the failure of the District 2075 cross-levee.

By January 6, 1997, District 17 had been responding to multiple threats to its levee system. Hourly patrols revealed boils, seepage, and various threats posed by the floodwaters.

As of January 6, 1997, the campground was under an average of six to 10 feet of water. The campground's occupants had been forced to evacuate because of the floodwaters.

In the early hours of January 7, 1997, an upstream levee in District 2075 broke. The levee, located near Perrin Road, lies south of District 17.

District 17's trustees learned of the break and of the potential for water to accumulate along District 17's south levee. District 17 began to prepare for anticipated flooding. The trustees began directing the installation of sandbags along the levee.

Water from the Perrin Road break flowed northward, inundating Districts 2094 and 2096. A trustee of District 2096 described the flooding as a "horizontal avalanche." Water began rising rapidly in the area, flooding

homes in District 2096. The waters rose along District 17's levee and the levees of Districts 2096 and 2094. The river was at flood stage, and the waters rose on the land side of the levees.

By 10:30 a.m. on January 7, 1997, the waters had risen within a few feet of the top of the Districts 2094 and 2096 levees. District 17 and District 2096 trustees raised the Walthall Slough floodgate to begin releasing floodwaters back into the river. However, the floodwater continued to rise against the land-side levees of District 17 and Districts 2094 and 2096.

Simultaneously, water began to rise along the eastern stretch of District 17's southern levee. The trustees believed that if the water reached the end point of the south levee, the water would flow eastward around the levee and inundate the entire district.

At 11:00 a.m. on January 7, 1997, the District 17 trustees held an emergency meeting. They met on the District 2096 levee, near the Walthall Slough floodgate. The trustees ascertained the water on the land side of the Districts 2094 and 2096 levees was three to four feet higher than the water level in the river and rising rapidly. The trustees believed the surging water could travel around the east end of the levee, causing a failure that would completely flood District 17.

The District 17 trustees unanimously declared a state of emergency and found it necessary to cut a portion of the Districts 2094 and 2096 levees to allow the floodwaters to flow back into the river.

The president of District 2096 concurred that an emergency existed and approved the cutting of the levee. According to the president, if District 17 had not cut the levee, he would have done so himself.

A District 17 trustee located a bulldozer and operator at nearby Brown Sand. District 17's trustees and the District 2096 president conferred as to the site of the cut. After the location was determined, the bulldozer operator was directed to cut the levee.

The bulldozer made the first cut, but the water continued to rise. The water began to flow from the land side back into the river. The cutting continued to a point about 100 feet north of the bend in the levee.

The cuts released floodwater that had been building up on the land side of levee 2096 following the Perrin Road levee break. The cuts channeled the water west toward the river and the campground. Diverting the water west toward the river prevented the water from flowing around the eastern end of

the District's levee, the levee directly north of District 2096. The cuts on the District 2096 levee lowered the depth of the water pressing against the land side of the levee, reducing the area of potential flooding. However, diverting the water back to the river necessarily caused the campground, which lay between the District 2096 levee and the river, to flood.

Making a relief cut at the lower end of an area protected by levees is an established method for lowering the depth of impounded water following the failure of a primary levee. Lowering the depth of the floodwater reduces the potential flood and prevents the further movement of water upstream. District 17's relief cut was consistent with previous similar actions. A few days after District 17's relief cut, District 2062 made a similar relief cut following the failure of one of its levees.

The campground general manager believed a crisis was brewing when he observed the flooding of January 7, 1997. The general manager watched the cutting of the levee and believed it necessary.

The director of the County Office of Emergency Services attested to the appropriateness of the relief cut. After an upstream levee failure, a relief cut would be made at the low end of the flooded area in order to lower the depth of impounded water and assist in preventing the failure of District 17's cross-levee. The director expressed confidence in the competence of District 17's trustees.

Later, on the afternoon of January 7, 1997, District 17 trustees met at the end of the levee. The floodwaters continued to rise and threatened to flow around the end of the levee into District 17. The trustees agreed the state of emergency was continuing and that an extension to the levee should be immediately constructed. The trustees immediately began an emergency extension of the levee.

The Perrin Road levee break stretched 1,000 feet and remained open until February 20, 1997. Water flowed across the campground for approximately two months.

## The Aftermath

Trails filed a second amended complaint for damages against District 17 for strict liability, inverse condemnation, negligence, dangerous and defective condition, trespass, and nuisance. District 17 answered, arguing its actions were undertaken in the exercise of emergency power and police power, and claiming immunity under section 820.2.

Subsequently, Trails filed a motion for leave to file a third amended complaint. The trial court denied the motion.

District 17 filed a motion for summary adjudication of the inverse condemnation cause of action. The trial court granted the motion, finding "Emergency doctrine precludes recovery for Plaintiff's Claim of inverse condemnation."

District 17 filed a motion for summary judgment or, in the alternative, summary adjudication of causes of action. The court granted the motion, concluding: ". . . Government Code section 820.2 and the emergency exception to Government Tort Liability are applicable . . . and the immunity for discretionary acts is a complete defense to plaintiffs' actions for nuisance, trespass, dangerous condition of public property, strict liability and negligence." Following entry of judgment, Trails filed a timely notice of appeal.

## DISCUSSION

*Standard of Review*

■ Summary judgment is properly granted if there is no question of fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719].) We construe the moving party's papers strictly and the opposing party's papers liberally. ■ (*Shively v. Dye Creek Cattle Co.* (1994) 29 Cal.App.4th 1620, 1627 [35 Cal.Rptr.2d 238].) The moving party must demonstrate that under no hypothesis is there a material factual issue requiring a trial, whereupon the burden of persuasion shifts to the opposing party to show, by responsive statement and admissible evidence, that triable issues of fact exist. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*); *Lorenzen-Hughes v. MacElhenny, Levy & Co.* (1994) 24 Cal.App.4th 1684, 1688 [30 Cal.Rptr.2d 210].)

However, "[f]rom commencement to conclusion, the moving party bears the burden of persuasion that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. [Fn. omitted.] There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra*, 25 Cal.4th at p. 845.) ■ On appeal, we exercise our independent judgment to determine whether there are no triable issues of material fact and the moving party thus is entitled to judgment as a matter of law. (*Sanchez v. Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461, 1466 [55 Cal.Rptr.2d 415].)

*Immunity Under Section 8655*

Trails argues the trial court erred in granting summary judgment based on immunity under the California Emergency Services Act (Act) (§ 8550 et seq.) Trails contends the lack of a specific flood fight plan dooms District 17's claim of immunity. In addition, Trails claims District 17 failed to act reasonably during the crisis, and therefore its actions fall outside any applicable legal immunity.

*The Act*

Section 8655 provides: "The state or its political subdivisions shall not be liable for any claim based upon the exercise or performance, or the failure to exercise or perform, a discretionary function or duty on the part of a state or local agency or any employee of the state or its political subdivisions in carrying out the provisions of this chapter." Section 8558 establishes three degrees of emergency: state of war emergency, state of emergency, and local emergency.

■ The purpose of the Act is self-explanatory. In situations in which the state must take steps necessary to quell an emergency, it must be able to act with speed and confidence, unhampered by fear of tort liability. A state of emergency imposes severe time constraints, forcing decisions to be made quickly and often without sufficient time to carefully analyze all potential repercussions. Therefore, the immunity granted by the Act is broad and specifically extended to encompass not only discretionary actions, but also the performance of or failure to perform those discretionary actions. (*LaBadie v. State of California* (1989) 208 Cal.App.3d 1366, 1369 [256 Cal.Rptr. 604] (*LaBadie*).)

*Lack of a Flood Fight Plan*

According to Trails, District 17 engaged in "renegade floodfighting" without regard to any "Floodfight Plan." Trails labels District 17's action in cutting the levee a "hastily improvised remedy" developed by a small coterie of trustees standing atop the threatened levee.

In support of its argument, Trails makes numerous references to a post-1997 flood fight plan later adopted by District 17. Trails faults District 17 for not following specifics of the plan adopted in December 1997, some 11 months after the emergency.

According to Trails, the Act "has a carefully articulated chain of command for disaster planning and careful coordination of floodfight procedures.

Nothing is more detrimental to the orderly fighting of a flood than when disagreement among responsible governmental entities and each local agency goes off and effectuates its own plans." Trails argues District 17 "utterly failed to establish that the acts it took were those authorized by the approved Floodfight Plan, thereby expressly precluding application of any immunity claim under . . . section 8558 . . . ."

We disagree. The undisputed facts show that, faced with the prospect of massive flooding, the Governor of California, the County, and the District 17 trustees declared a state of emergency. District 17's board of directors later adopted the trustees' declaration of emergency. The Act does not require that specific actions undertaken during a flood emergency be codified in a preexisting flood fight plan.

Trails cites no authority for its insistence that the trustees must follow a carefully mapped-out scheme of flood prevention in order to avail themselves of immunity. Such a requirement is inimical to the purpose of the Act: to allow decision makers to act quickly during emergencies to protect the public.

Nor does District 17's later adoption of a flood fight plan alter our views. It strains credulity to hold District 17 to standards it promulgated in the wake of disaster. To strip an agency of immunity because after the fact it attempts to improve its response to an emergency would be contrary to a public policy of promoting public safety. Penalizing subsequent efforts to improve public safety would severely undermine the purpose of the Act.

*Reasonableness of District 17's Actions*

Trails argues no immunity can apply unless District 17 establishes the reasonableness of its actions in cutting the levee. According to Trails, District 17 acted unreasonably in cutting a levee outside its jurisdiction. District 2096 maintained the levee District 17 ordered cut. Trails also points out that District 2096 never formally approved the cuts.

However, under section 8656: "All of the privileges and immunities from liability . . . which apply to the activity of officers, agents, or employees of any political subdivision when performing their respective functions within the territorial limits of their respective political subdivisions, shall apply to them to the same degree and extent while engaged in the performance of any of their functions and duties extraterritorially under this chapter." Under section 8656, District 17's immunity under the emergency declaration extended to its activities on levees outside its territory or jurisdiction.

Trails points to a variety of facts it claims rendered District 17's action in cutting the levee unreasonable: District 17 authorized only one levee cut,

District 17 was not present on the levee when Brown Sand made the cut, the emergency was created as a result of District 17's failure to strengthen the levee, and the levee was not constructed to standard width.

Despite Trails's claim to the contrary, District 17, in support of its summary judgment, presented evidence of the reasonableness of its actions.

Ron Baldwin, director of the County Office of Emergency Services, declared, in part: "In the early morning hours of January 7, 1997 the primary levee of Reclamation District 2075 failed near Perrin Road causing extensive flooding in Reclamation Districts 2075, 2094 and 2096. Movement of the flood waters further downstream (north) into Reclamation District 17 was prevented by the existence of a cross levee located at the southern boundary of that district. It was my expectation after this levee failure that a relief cut would again be made at the low end of the inundated area in order to lower the depth of impounded water and assist in preventing failure of the Reclamation District 17 cross levee. During the day I became aware that efforts were under way by Reclamation District 17 officials and engineers to make this relief cut. My knowledge of the individuals involved and the actions being taken caused me to feel that the situation was being handled competently and that intervention on my part was not necessary. [¶] . . . The creation of a relief cut at the lower end of an area protected by levees and with a sufficient river gradient is an established method for lowering the depth of impounded water following a failure of the primary levee. Lowering the depth of impounded water reduces the area that will be flooded and assists in efforts to prevent further movement of water downstream. Creation of the relief cut by Reclamation District 17 officials was consistent with previous similar actions and with the subsequent creation of a relief cut on Reclamation District 2062 following failure of that district's primary levee on January 10, 1997."

We find Trails's attempts to create a triable issue of fact unavailing. Trails questions the location, size, and supervision of the cuts in an attempt to show that District 17's actions were unreasonable. However, as Baldwin's declaration states, the act of cutting the levee, given the emergency situation, was both an effective and appropriate emergency response.

■ To subject the emergency measures taken by governmental entities to the type of microscopic examination suggested by Trails would run afoul of the very purposes of section 8655. "Under the severe time constraints inherent in a declared state of emergency, decisions must be made quickly and often without the time necessary to carefully analyze all of the potential repercussions. As a result, the immunity granted under this section . . . is

specifically extended to encompass not only the 'discretionary' act but also the 'performance of' or 'failure to perform' that act." (*LaBadie, supra*, 208 Cal.App.3d at p. 1369.)

Given the undisputed facts on the record before us, we find the trial court did not err in granting summary judgment. During a declared state of emergency, District 17's trustees, in an effort to prevent massive flooding, cut a District 2096 levee. The Act recognizes the split-second decisionmaking necessitated by an unfolding emergency. Section 8655 provides immunity to state agencies in their efforts to protect public safety in times of crisis. District 17's act of cutting the levee falls under this immunity.

Nothing in the record before us casts doubt upon the decisions made by District 17 during the emergency; District 17's actions appear both reasonable and focused on the primary goal of insuring public safety in a time of crisis. The court properly granted summary judgment in favor of District 17 based on the Act.[3]

*Inverse Condemnation*

Intertwined with Trails's discussion of immunity is a rather confusing discussion of "police power" and District 17's alleged misuse of this police power. Although unclear, Trails appears to challenge the trial court's grant of summary adjudication of its inverse condemnation cause of action under the emergency doctrine.

In its amended complaint, Trails alleged inverse condemnation based on District 17's negligence in cutting the levee. According to Trails, District 17's actions promoted no public purpose, District 17 breached a duty not to damage the campground, District 17 trustees should have taken time to consult with engineers, and District 17 negligently failed to adopt a flood fight plan.

■ Article I, section 19 of the California Constitution provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." Under this provision, if private property is wrongfully damaged or destroyed by government action, then an inverse condemnation action may lie to establish the owner's damages. The inverse condemnation action is independent of any right to sue under traditional tort theories. (*Odello Brothers v. County of Monterey* (1998) 63 Cal.App.4th 778, 785–786 [73 Cal.Rptr.2d 903] (*Odello*).)

---

[3] Since we find summary judgment appropriate under section 8655, we do not address the court's finding of immunity under section 820.2.

■ The proper exercise of a public entity's police power is an exception to the just compensation requirement in inverse condemnation cases. This "emergency exception" arises " 'when damage to private property is inflicted by government "under the pressure of public necessity and to avert impending peril." ' " (*Odello, supra*, 63 Cal.App.4th at pp. 788–789.) Courts narrowly circumscribe the type of emergency that shields an entity from inverse condemnation liability. (*Id.* at p. 789.)

The Supreme Court explained the rationale for narrowly construing the emergency exception: " 'The state or its subdivisions may take or damage private property without compensation if such action is *essential* to safeguard public health, safety or morals. [citing authorities.] *In certain circumstances, however, the taking or damaging of private property for such a purpose is not prompted by so great a necessity as to be justified without proper compensation to the owner.* [citing authorities.]' (Italics added [by *House* court].) Thus there is recognized the incontestable proposition that the exercise of the police power, though an essential attribute of sovereignty for the public welfare and arbitrary in its nature, cannot extend beyond the necessities of the case and be made a cloak to destroy constitutional rights as to the inviolateness of private property." (*House v. L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 388–389 [153 P.2d 950].)

Trails analogizes its situation to that of the plaintiff in *Odello*, arguing that as in *Odello* a triable issue of fact exists as to whether the emergency exception applies.

In *Odello*, the plaintiff owners of an artichoke ranch sued the county for inverse condemnation, asserting the county intentionally breached a flood control levee and flooded their property. The trial court entered summary judgment in favor of the county. (*Odello, supra*, 63 Cal.App.4th at pp. 782–784.) The appellate court reversed. (*Id.* at p. 793.)

The appellate court found the emergency exception to the just compensation requirement inapplicable. The evidence revealed the levee was breached because of the inadequacy of another levee that threatened other, more populated property. (*Odello, supra*, 63 Cal.App.4th at pp. 781–782.) Ten years earlier, a county board of supervisors resolution recognized the existence of the flood hazard and endorsed a flood control project. Six years before the flood, the county flood control district developed a flood control project to alleviate flooding danger for the more populated areas. The project was never implemented. (*Id.* at p. 782.)

Two months before the flood, the Carmel River overflowed its banks and flooded nearby fields. The plaintiffs' fields were protected by the levee. (*Odello, supra*, 63 Cal.App.4th at p. 783.)

In March 1995 heavy rains again raised the threat of flooding. The county declared a state of emergency and decided to breach the levee. By breaching the levee, the county hoped to prevent flooding of commercial and residential areas. The breach instead flooded the plaintiffs' property, destroying their crops and other property. (*Odello, supra*, 63 Cal.App.4th at p. 783.)

The appellate court found questions of fact precluded summary judgment: "We are certainly mindful of the danger of second-guessing the decisions of public entities regarding public works and emergency situations. On the other hand, we do not think that the public interests are served by simply ignoring County's prior knowledge of the flood threat. Nor do we think it is either fair or reasonable to deny appellants compensation simply because County has established that it declared an emergency on March 10, 1995. . . . Accordingly, in this case, the determination regarding County's liability cannot be based solely upon the situation which existed on March 10, 1995. The emergency action was necessary due to the inadequacy of the Mission Fields Levee, an inadequacy which was acknowledged by the County as early as 1989, and an inadequacy which had caused flooding during January 1995, just two months prior to County's March 1995 'emergency' action. In such circumstances, the emergency exception should not shield County from liability for inverse condemnation because ' "the taking or damaging of private property . . . is not prompted by so great a necessity *as to be justified without proper compensation to the owner.* [Citations.]" ' " (*Odello, supra,* 63 Cal.App.4th at p. 791, italics added by *Odello* court.)

In the present case, Trails fails to cite any prior knowledge on the part of District 17 regarding the instability of the levee system. All the evidence points to an extraordinary event: massive flooding up and down the Central Valley caused by torrential rains. The record reveals no uncompleted prior flood control projects. Nor does the record reflect prior flooding of the same area sufficient to put District 17 on notice of potential levee failures. We find the present case distinguishable from the facts of *Odello*.

Nor does the evidence reveal that District 17's actions prior to the flooding caused the levee to fail as Trails suggests. The District 17 levees met FEMA standards for a 100-year level of protection and complied with both state and county requirements for levee maintenance.

Trails also claims Brown Sand's refusal to allow District 17 to widen and strengthen the levee necessitated the relief cuts. In support, Trails relies on testimony by District 17 trustee Albert Muller.

Our review of Muller's testimony reveals the trustee did not state the levee failed to meet state standards or that the relief cut was necessary because the

levee was too narrow. Nor did Muller testify that Brown Sand refused to allow the levee to be widened.

■   The undisputed facts give rise to the emergency exception to an action for inverse condemnation. The Supreme Court has framed the question thusly: " 'Always the question in each case is whether the particular act complained of is without the legitimate purview and scope of the police power.' " (*Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, 383 [41 Cal.Rptr.2d 658, 895 P.2d 900], quoting *Gray v. Reclamation District No. 1500* (1917) 174 Cal. 622, 639 [163 P. 1024].) Here, the actions of the District in cutting the levee to prevent potentially massive flooding were a legitimate exercise of police power.

*Denial of Leave to Amend*

■   Code of Civil Procedure section 473, subdivision (a)(1) governs amendment of pleadings and states, in part: "The court may likewise, in its discretion, after notice to the adverse party, allow, upon any terms as may be just, an amendment to any pleading . . . ." On appeal, we review a trial court's denial of leave to file an amended complaint for an abuse of discretion. (*Record v. Reason* (1999) 73 Cal.App.4th 472, 486 [86 Cal.Rptr.2d 547].)

Trails contends the trial court abused its discretion in denying it leave to file a third amended complaint. According to Trails, discovery completed after the filing of the second amended complaint revealed facts supporting an additional cause of action for inverse condemnation against District 17.

During discovery, Trails obtained minutes of a District 17 board meeting on December 3, 1997, at which the board adopted a flood fight plan. In addition to the flood fight plan, Trails also received a map outlining the plan.

Trails argues the plan provides that in the event of an upstream levee break, District 17 would make a cut identical to the cut made during the 1997 floods. This action would once again inundate the campground. According to Trails, by adopting the flood fight plan, District 17 exacted a right-of-way through Trails's property, which constituted a taking for which Trails is entitled to compensation.

Trails's proposed amendment poses a temporal quandary. Trails contends District 17's proposed response to potential upstream flooding and levee failures puts the campground at risk of possible future flooding. If massive flooding occurs, if an upstream levee fails, and if District 17 cuts the levee, then Trails will experience damage.

As District 17 points out, a cause of action does not exist for inverse condemnation premised upon a risk of future flooding. In *Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245 [54 Cal.Rptr.2d 340] (*Jordan*), the plaintiffs filed suit against public agencies for nuisance and inverse condemnation. The plaintiffs argued the discharge of effluent into a river near sewage treatment facilities exacerbated the growth of vegetation in the river channel. (*Id.* at p. 1252.) This growth threatened to divert floodwaters onto the plaintiffs' land. (*Id.* at p. 1253.)

The appellate court found the threat of future possible flooding could not support a cause of action for inverse condemnation. The court explained: "[A]n action for inverse condemnation is generally available only where the taking results in property damage, other depreciation in market value, or unlawful dispossession of the owner. [Citations.] Damage from invasions of water or other effluents often provides a basis for liability. [Citation.] Physical damage is not invariably a prerequisite to compensation for inverse condemnation liability. [Citation.] However, '[t]he very definition of a "taking" requires an "act" . . . , and the risk of future flooding is not an act.' [Citation.]" (*Jordan, supra,* 46 Cal.App.4th at p. 1257.) The court concluded the risk of future flooding does not give rise to a claim for inverse condemnation, and the damages claimed by the plaintiffs were speculative. (*Id.* at p. 1261.)

Here, the trial court found *Jordan* controlling and denied the motion for leave to amend. Trails disagrees, arguing *Jordan* dealt with a situation in which flooding might cause damage, whereas in the present case the flood fight plan would necessarily cause flooding and destruction to its property.

In support, Trails cites *CUNA Mutual Life Ins. Co. v. Los Angeles County Metropolitan Transportation Authority* (2003) 108 Cal.App.4th 382 [133 Cal.Rptr.2d 470] (*CUNA*). In *CUNA*, the owner of an historic building brought an inverse condemnation action to recover expenses incurred in protecting the building from the transportation agency's construction of a metro rail station. The trial court found for the agency, holding there had been no damage to the building caused by the construction, and without damage there could be no recovery for mitigation expenses. (*Id.* at p. 385.)

The appellate court reversed. The court held that actual physical damage to the subject property is not a prerequisite to an award of mitigation of damages. The court distinguished *Jordan* on two grounds. First, the court noted *Jordan* did not involve mitigation expenses but only inverse condemnation. Second, the court noted *Jordan* found the claimed damage speculative because "there had been no flood, there might never be a flood, and it was not possible to calculate any loss that the property owners might suffer from

some unknown flood." (*CUNA*, *supra*, 108 Cal.App.4th at p. 401.) In contrast, the *CUNA* court found the mitigation damages claimed by the property owner were not speculative since they had already been incurred. Nor was the tunneling and station excavation speculative: they had been completed by the time of trial. (*Id.* at pp. 401–402.)

■ *CUNA* in no way undercuts *Jordan's* basic premise: a risk of future flooding and concomitant harm does not give rise to a cause of action for inverse condemnation. The sequence of events postulated by Trails rests on speculation; the possibility of massive flooding remains a possibility, not a certainty. We find the trial court did not abuse its discretion in denying Trails leave to amend.

## DISPOSITION

The judgment is affirmed. District 17 shall recover costs on appeal.

Scotland, P. J., and Sims, J., concurred.