# United States Court of Appeals for the Federal Circuit

---

**TRINCO INVESTMENT COMPANY, AND
KATHLEEN G. ROSE, trustee of the V&M Rose –
Marital Trust,**
*Plaintiffs-Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-5139

---

Appeal from the United States Court of Federal Claims in No. 11-CV-0857, Judge Bohdan A. Futey.

---

Decided: July 18, 2013

---

MATTHEW J. DOWD, Wiley Rein, LLP, of Washington, DC argued for plaintiffs-appellants. Of counsel on the brief was WESLEY HIGBIE, Higbie Law Office, of San Mateo, California.

NINA C. ROBERTSON, Attorney, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief was IGNACIA S. MORENO, Assistant Attorney General.

Before RADER, *Chief Judge*, and MOORE, *Circuit Judge,*
and BENSON, *District Judge.* [*]

BENSON, *District Judge.*

TrinCo Investment Company and Kathleen G. Rose
(collectively "TrinCo") appeal the decision of the United
States Court of Federal Claims ("CFC") granting the
Government's Motion To Dismiss. The CFC found that
TrinCo failed to plead facts sufficient to support a takings
claim against the Government following the destruction of
1,782 acres of TrinCo's merchantable timber as a result of
a United States Forest Service fire management effort.

Because we find that TrinCo pled sufficient facts to
state a claim for relief that is plausible on its face, we
*reverse* and *remand.*

## BACKGROUND

Appellants collectively own five pieces of real property
in California. Appellant TrinCo Investment Company, a
California limited partnership, owns four pieces of proper-
ty: the Squaw Camp Property, the Price Creek Property,
the Mud Springs Property, and the Eltapom Rose Proper-
ty. These properties consist of 714, 524.3, 529.5 and 604.8
timbered acres respectively, all of which are surrounded
by the Shasta-Trinity National Forest. Appellant Kath-
leen G. Rose is a trustee of the V&M Rose Trust-Marital
Trust. The Rose Trust owns the V&M Bottoms Property
which consists of 57 timbered acres which are adjacent to
the Shasta-Trinity National Forest.

The Shasta-Trinity National Forest is the largest na-
tional forest in California, encompassing approximately

---

[*] Honorable Dee V. Benson, United States District
Court for the District of Utah, sitting by designation.

2.1 million acres. *See* U.S. Dep't of Agriculture, Forest Service, *Shasta-Trinity National Forest: About the Forest, at http://www.fs.usda.gov/main/stnf/about-forest.* In June, 2008, a series of wildfires burned within the Shasta-Trinity National Forest. The United States Forest Service ("Forest Service") named these fires the "Iron Complex" fire. In response to the Iron Complex fire, the Forest Service intentionally lit fires directly on and adjacent to TrinCo's properties in order to reduce unburned timber which might fuel the Iron Complex fire. These intentional fires caused damage to TrinCo's properties, burning 714 acres of Squaw Camp, 92 acres of Eltapom Rose, 395.1 acres of Mud Springs, 524.3 acres of Price Creek, and 57 acres of V&M Bottoms in July and August of 2008.

TrinCo's complaint alleges that the Iron Complex fire would not have burned any of its land. However, the Forest Service's intentional fires destroyed 1,782 acres of TrinCo's merchantable timber valued at approximately $6.6 million. TrinCo asserts that the damages caused by the Forest Service's conduct constitute a taking for which it should be compensated under the Fifth Amendment to the Constitution of the United States.

The Government moved to dismiss the case before the CFC under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") for failure to state a claim upon which relief can be granted. The Government asserts that the intentional lighting of fires by the Forest Service to manage existing wildfires cannot sustain a plausible takings case because the doctrine of necessity absolves the Government from liability for any taking or destruction of property in efforts to fight fires. The CFC granted the motion to dismiss. TrinCo now appeals that decision.

DISCUSSION

Our jurisdiction arises under 28 U.S.C. § 1295(a)(3). Because we are reviewing a dismissal under RCFC 12(b)(6) "the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the claimant's favor." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

The Fifth Amendment to the Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. As its language indicates, "this provision does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304, 314 (1987). However, the United States Supreme Court has observed that the "common law ha[s] long recognized that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of the many and the lives of many more could be saved." *United States v. Caltex*, 344 U.S. 149, 154 (1952). This principle, "absolving the State…of liability for the destruction of 'real and personal property, in cases of actual necessity, to prevent'…or forestall…grave threats to the lives and property of others," is commonly referred to as the "doctrine of necessity" or the "necessity defense." *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1029 n.16 (1992).

The CFC relied upon this doctrine of necessity when it held that TrinCo's complaint failed to plead facts sufficient to support a takings claim against the Government. In particular, the CFC relied upon its interpretation of a footnote in *Lucas v. S.C. Coastal Council*, which refers to the doctrine of necessity as "absolving the State . . . of liability for the destruction of 'real and personal property, in cases of actual necessity, to prevent the spreading of a

fire.'" 505 U.S. 1029 n.16 (quoting *Bowditch v. City of Boston*, 101 U.S. 16, 18–19 (1880)). However, the CFC misapprehended the reach of the doctrine of necessity, impermissibly expanding its scope to absolve the Government of liability for any of its actions so long as they are part of an effort to control or prevent fire. While it is true that the Supreme Court has recognized that there are circumstances in which the doctrine of necessity protects the Government from the requirement that it provide compensation for the taking or destruction of property committed to stop a fire, *see Bowditch*, 101 U.S. at 18–19, the CFC's decision to extend the doctrine of necessity to automatically absolve the Government's action in any case involving fire control stretches the doctrine too far.

While there is no case law on point for TrinCo's case, the existing precedent indicates that there are certain prerequisites that must be met before the doctrine of necessity can be applied to absolve the Government of a duty to compensate a party for lost property. The Supreme Court has consistently held that the doctrine of necessity may be applied only when there is an imminent danger and an actual emergency giving rise to actual necessity. *See Bowditch*, 101 U.S. at 16–19; *Ralli v. Troop*, 157 U.S. 386, 405 (1985); Caltex, 344 U.S. at 151–56; *Mitchell v. Harmony*, 54 U.S. 115, 135 (1851).

For instance, in *Bowditch*, the Supreme Court applied the doctrine of necessity to absolve the City of Boston of liability for the actions of its "fire-engineers" who demolished a building that was not yet burning, but was located "at a place of danger in the immediate vicinity [of a fire], to arrest the spreading of the fire." 101 U.S. at 16. The Court noted that "the measure [i.e., destroying the building] stopped the progress of the fire." *Id.* Ultimately, the Court found that "[a]t the common law everyone had the right to destroy real and personal property, in cases of actual necessity, to prevent the spreading of a fire, and

there was no responsibility on the part of the destroyer, and no remedy for the owner." *Id.* at 18–19. The Court emphasized the need for an imminent danger and an actual emergency necessitating the Government taking, stating that the "rights of necessity" which were a part of the common law and a principle of natural law relied on "imperative necessity" as legal justification. *Id.* at 18–19; *see also Ralli v. Troop*, 157 U.S. at 405 (stating that "either public officers or private persons my raze houses to prevent the spreading of a conflagration" without being "bound to compensate for or to contribute to the loss," but that "this right rests on public necessity").

The Supreme Court further emphasized the doctrine of necessity's prerequisites of imminent danger and actual emergency necessitating Government action in *United States v. Caltex,* 344 U.S. 149 (1952). In *Caltex* the Supreme Court found that no compensable taking had occurred when the United States Military requisitioned and destroyed oil facilities in the Philippines during World War II "[i]n the face of a Japanese advance." *Id.* at 151. The oil companies' properties were requisitioned on December 25, 1941 when a Japanese advance was imminent. *Id.* On December 27, while Japanese planes were bombing the area in which the facilities were located, the oil companies were directed to destroy "all remaining petroleum products and the vital parts of the plants." *Id.* On December 31, while Japanese troops were entering the area, Army personnel completed a successful demolition of the oil facilities. The Army paid the oil companies for the petroleum stocks and transportation equipment which were either used or destroyed by the Army, "but it refused to compensate [the companies] for the destruction of the . . . facilities." *Id.* The oil companies sued, "[c]laiming a constitutional right under the Fifth Amendment to just compensation." *Id.* The Supreme Court acknowledged that "[n]o rigid rules can be laid down to distinguish compensable losses from non-compensable losses" and

that "[e]ach case must be judged on its own facts." *Id.* at 156. It went on to hold that "[t]he terse language of the Fifth Amendment is no comprehensive promise that the United States will make whole all who suffer from every ravage and burden of war." *Id.* The Supreme Court held further that the destruction of the facilities "in the face of their impending seizure by the enemy" was a necessary and non-compensable taking because of the actual necessity of the action in the face of an imminent danger and actual emergency. *Id.*; *see also Mitchell v. Harmony*, 54 U.S. at 135 (stating that for a taking to be justified during wartime the "danger must be immediate and impending" or the "necessity urgent . . . such as will not admit delay" because "it is the emergency that gives the right [to the Government to take private property], and emergency must be shown to exist before the taking can be justified").

This Supreme Court precedent requires an actual emergency with immediate and impending danger to support a necessity defense. These requirements are similarly apparent in the application of the necessity defense by state courts. For instance, in *Customer Co. v. City of Sacramento*, the Supreme Court of California held that a store owner could not recover for damages to a building sustained as a result of police efforts to apprehend a suspect who had taken refuge in that building. 895 P.2d 900, 901–17 (Cal. 1995). The Supreme Court of California held that the "doctrine of noncompensable loss comes into play in connection with more direct 'taking' or 'damaging' of property *only* under 'emergency' conditions; i.e., when damage to private property is inflicted by Government 'under pressure of public necessity and to avert impending peril.'" *Id.* at 910 (emphasis added) (quoting *Holtz v. Superior Court*, 475 P.2d 441, 446 (Cal. 1970)); *see also House v. Los Angeles County Flood Control District*, 153 P.2d 950, 953 (Cal. 1944) (holding that

dismissal of a takings claim was not warranted when no emergency existed).

The Supreme Court of Texas recognized similar requirements in *Steele v. City of Houston*, 603 S.W.2d 786 (Tex. 1980). The Texas Supreme Court held that the necessity defense did not protect the City of Houston from liability for damage to a property caused by police firing incendiary devices into a house in an attempt to drive out and capture escaped convicts who were hiding within it. In making this holding the Texas court noted that while the "defendant City of Houston may defend its actions by proof of a great public necessity,…[m]ere convenience will not suffice." *Id.* at 792. The Texas Supreme Court ultimately held that the City of Houston had only offered scant proof of the necessity driving its actions, and therefore was not protected by the necessity defense. *Id.*

No precedent exists to support the assertion that any action taken for the purpose of fire prevention is protected by the necessity doctrine in the absence of actual emergency, imminent danger, and the actual necessity of the Government action. Therefore, the CFC's decision holding that the taking or destruction of any property in the pursuit of fighting a fire, regardless of the circumstances, is non-compensable misconstrues the breadth of the doctrine of necessity.

The facts, as they are pled in TrinCo's complaint, do not demonstrate that the Iron Complex fire had created an imminent danger and an actual emergency necessitating the burning of 1,782 acres of TrinCo's timbered acreage. The facts certainly do not support the kind of imminent danger and actual emergency posed by a fire burning in a populated city, as in *Bowditch*, or an invading enemy army, as in *Caltex*. Therefore, dismissal of the complaint under RCFC 12(b)(6) based on the doctrine of necessity was inappropriate.

To avoid dismissal under RFCF 12(b)(6), a party need only plead "facts to state a claim to relief that is plausible on its face," with facts sufficient to nudge "claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

It is certainly plausible that the Iron Complex fire did not pose an imminent danger or actual emergency necessitating the destruction of such a sizable portion of TrinCo's property. TrinCo has suffered an actual harm and pled facts that give rise to a plausible claim for relief. It is impossible, without further inquiry, to determine whether the requisite imminent danger and actual emergency giving rise to the actual necessity of the Forest Service's burning of TrinCo's property was present to absolve the Government under the doctrine of necessity. TrinCo's complaint is sufficient to survive dismissal at this early stage of the proceedings.

SUMMARY & CONCLUSION

In the proceedings below, the Government advanced, and the CFC accepted, the position that any act undertaken by the Government in connection with fighting a fire is covered by the necessity defense. Therefore, the court found that TrinCo's complaint could not support a claim for relief because the complaint acknowledged that TrinCo's property was taken by the Government while fighting the Iron Complex fire of 2008.

As addressed above, however, every taking by the Government in the name of fire control does not automatically qualify as a necessity sufficient to satisfy the requirements of the necessity defense. The necessity defense is just what it says it is: a defense. It has always required a showing of imminent danger. The use of the

word "necessity" in the title is no accident. The defense requires both an actual emergency and an imminent danger met by a response that is actually necessary. Not every seizure of a private citizen's property will qualify.

In the case below there are legitimate questions as to imminence, necessity, and emergency. While there is no doubt that there was a fire, there is also no doubt that at the time TrinCo's property was burned, only approximately 2% of the 2.1 million-acre national forest was in flames. It is clearly relevant to the present case to learn in discovery why the Plaintiff's property had to be sacrificed, as opposed to other property, including other portions of the National Forest itself. It would be a remarkable thing if the Government is allowed to take a private citizen's property without compensation if it could just as easily solve the problem by taking its own.

**REVERSED AND REMANDED**