*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| WILLIAM BREWER II, DONNA BREWER, WILLIAM BREWER III, STEPHANIE BREWER, CHARLES GRAY, MARGARET GRAY and ALLEN GRAY, | ) ) ) ) ) | Supreme Court No. S-14916 |
| | ) | Superior Court No. 4FA-10-02618 CI |
| | ) | |
| | ) | O P I N I O N |
| Appellants, | ) | |
| | ) | No. 6968 - November 28, 2014 |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Douglas Blankenship, Judge.

Appearances: William R. Satterberg, Jr., Law Offices of William R. Satterberg, Jr., Fairbanks, for Appellants. J. Anne Nelson, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Stowers, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

MAASSEN, Justice.

## I.    INTRODUCTION

Major forest fires swept through areas south of Fairbanks in the summer of 2009 and approached properties owned by the appellants (the landowners).  In an effort to save the landowners' structures, firefighters working under the direction of the State Department of Forestry intentionally set fire to the landowners' vegetation.  The burnouts deprived the advancing wildfires of fuel and saved the structures.  But the landowners sued the State, bringing a takings claim under the eminent domain provision of the Alaska Constitution, article I, section 18 (the Takings Clause), and tort claims for negligence and intentional misconduct.  We affirm the superior court's dismissal of the tort claims because of governmental immunity; we reverse its dismissal of the constitutional claim, remanding it to the superior court for further consideration of whether the specific exercise of the State's police powers at issue here was justified by the doctrine of necessity.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

During the summer of 2009, wildfires that came to be known as the Railbelt Complex developed in Interior Alaska, ultimately engulfing over 600,000 acres.[1]  The appellant landowners owned property in subdivisions known as Teklanika Channel Lake, Dune Lake, and Totek Lake, about 45 miles southwest of Fairbanks.  Their properties are on land designated by the State's "Alaska Interagency Wildland Fire Management Plan" (the Plan) as a "Full Management Option" fire protection area, meaning that the State anticipated an "aggressive initial attack dependent upon the availability of

---

[1]    *See* ALASKA INTERAGENCY COORDINATION CTR. PREDICTIVE SERVS. SECTION, ALASKA FIRE SEASON 2009:  WILDLAND FIRE SUMMARY & STATISTICS ANNUAL REPORT 18 (2009), *available at* http://fire.ak.blm.gov/content/aicc/stats/archive/2009.pdf.

suppression resources."[2]   The landowners and the State agree that, as the fires approached, firefighters acting under State authority entered the landowners' property and set fire to vegetation surrounding their structures; these fires were pushed out to meet the oncoming wildfires.  The tactic, called backfires or burnouts, is used to deprive an oncoming fire of fuel.[3]   According to the State, the Railbelt Complex fires passed through the subdivisions without damaging the landowners' structures; the landowners do not appear to dispute it.

---

[2]     The Plan sets four levels of fire management — Critical, Full, Modified, and Limited — with different planned responses and objectives for each.  The listed objectives for the Full Management Option are these:

> 1.     Control all wildland fires occurring within this management option at the smallest acreage reasonably possible on initial attack without compromising fire fighter safety.
>
> 2.     Protect sites or areas designated as Full management from the spread of wildland fires burning in a lower priority management option.
>
> 3.     Minimize damage from wildland fires to the resources identified for protection within the Full management designation commensurate with values at risk.

[3]     The State explains that "backfire" refers primarily to a fire set to attack and suppress an oncoming wildfire, whereas "burnout" refers primarily to a fire set in defense of designated areas behind control lines.  The State asserts that it set the fires at issue primarily to protect structures rather than to suppress the wildfire complex; we therefore use the term "burnout" in this opinion.

**B.     Proceedings**

Landowners William Brewer II and Donna Brewer, William Brewer III and Stephanie Brewer, Charles and Margaret Gray, and Cindy Walker[4] all filed suit against the State in 2010.  Each suit alleged a takings claim under article I, section 18 of the Alaska Constitution and tort claims alleging negligent and intentional acts.  The suits were consolidated in December 2010.  Allen Gray filed suit in March 2011, asserting identical harms and legal theories, and his suit was consolidated with the others.

The landowners moved for partial summary judgment, contending that the burnouts constituted a compensable taking as a matter of law and that the State's actions were intentional, making it liable in tort.  According to the landowners, the only remaining question of fact was the amount of just compensation they were due.  The State cross-moved for summary judgment, claiming governmental immunity and advancing a number of arguments against liability for a taking.

In subsequent filings the landowners elaborated on their claims.  They asserted that, in contravention of its stated policy of Full Management Option protection, the State made no attempt to minimize or suppress the wildfires, instead opting to burn "as much wildland forest as possible," impliedly for purposes of "fuels management."  The landowners offered affidavits alleging that the State conducted the burnouts even though there was no "imminent threat of fire damage" to their properties and the State could have "undertaken . . . the damaging fire suppression activities on bordering State-owned lands" instead.

The superior court granted summary judgment to the State.  As for the constitutional claim, the superior court decided that the State's actions did not constitute a taking because they were a valid exercise of its police powers.  As for the tort claims,

---

[4]     Walker was released from the suit before summary judgment.

the superior court concluded that the State was entitled to immunity under both AS 09.50.250 and AS 41.15.045.

The landowners filed this appeal.

## III. STANDARDS OF REVIEW

We review a grant of summary judgment de novo, affirming if there is no genuine dispute of material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.[5] We review the facts in the light most favorable to the non-moving parties and draw all reasonable inferences in their favor.[6] We review the Alaska Constitution and Alaska statutes de novo, "adopting rules of law that best reflect precedent, reason, and policy."[7]

## IV. DISCUSSION

### A. It Was Error To Dismiss The Landowners' Takings Claims.

Article I, section 18 of the Alaska Constitution — entitled "Eminent Domain" and commonly known as the Takings Clause — states that "[p]rivate property shall not be taken or damaged for public use without just compensation."[8] The landowners contend that the State damaged their private property for public use, entitling them to just compensation under the Constitution.

---

[5]   *Waiste v. State*, 10 P.3d 1141, 1144 (Alaska 2000).

[6]   *Id.* at 1144-45.

[7]   *Id.* at 1144.

[8]   We recognize that when the government takes private property for public use without paying just compensation and the property owner brings suit, the claim is not for eminent domain but for inverse condemnation. *See Mt. Juneau Enters., Inc. v. City & Borough of Juneau*, 923 P.2d 768, 773 (Alaska 1996). The constitutional provision on which such a suit is grounded, however — the Takings Clause — is entitled "Eminent Domain."

"We liberally interpret Alaska's Takings Clause in favor of property owners, whom it protects more broadly than the federal Takings Clause."[9] This protection applies to personal as well as real property and allows compensation for temporary as well as permanent takings.[10] Takings claims are not based in tort and do not require that the government act with any particular mental state.[11] The viability of a constitutional takings claim thus is unaffected by tort immunity, which is not constitutional but statutory.[12]

### 1.    The landowners allege a taking for public use.

For the landowners to state a claim entitling them to just compensation under the Takings Clause, they must show that the State damaged their property and did so for a public use. There is no dispute in this case that the landowners' property was damaged, nor that the damage was caused by the State. The parties do dispute, however, whether the damage was for a public use.

The landowners concede that the burnouts were intended to protect their structures; their quarrel is with when and where the State set the burnouts. They argue

---

[9]    *Waiste*, 10 P.3d at 1154.

[10]    *Id.*

[11]    *Cannone v. Noey*, 867 P.2d 797, 801 n.7 (Alaska 1994) ("If an owner is denied productive use of his or her property, that may be a taking regardless of the mental state of the involved government official, whether it be malicious, negligent, non-negligent but mistaken, or non-negligent and not mistaken.").

[12]    *State, Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904, 914 (Alaska 2001) ("[W]e cannot defer to the legislature when infringement of a constitutional right results from legislative action." (quoting *Valley Hosp. Ass'n v. Mat-Su Coalition for Choice*, 948 P.2d 963, 972 (Alaska 1997)) (internal quotation marks omitted)). *See also Thousand Trails, Inc. v. Cal. Reclamation Dist. No. 17*, 21 Cal. Rptr. 3d 196, 204 (Cal. App. 2004) ("The inverse condemnation action is independent of any right to sue under traditional tort theories.").

that the burnouts could have been conducted before the structures were directly threatened and could have been set on State-owned land instead of their private land. In the landowners' view, the burnouts damaged their property for a public use because "the State encouraged the burn off of the wildlands between the Kantishna and Teklanika rivers as far south as possible as a public project to rejuvenate the wildlands," an action which "obviously serves to benefit the public demand for, *inter alia*, game animals for human consumption." They allege a second public use as well: "to forestall the spread of the fire to State-owned lands, e.g. the Tanana Valley State Forest and other commercial forests."

The State takes two arguably contradictory positions in response to the landowners' takings claim. In support of its argument that it acted within the lawful exercise of its police powers, the State asserts "that the burnouts were part of the larger fire management effort, and that public purposes of promoting the general health, safety, and welfare of the public animate the police powers." On the other hand, the State argues that the burnouts were "not necessary to the overall fire suppression effort" and were conducted solely to prevent the destruction of the landowners' private structures — not a public use at all.

We find more persuasive the State's first argument — that it acted within the lawful exercise of its police powers. The United States Supreme Court has described the public use requirement of the federal Takings Clause as "coterminous with the scope of a sovereign's police powers."[13] One important aspect of the police power is the suppression and prevention of fires; indeed, "[p]erhaps the most striking application of

---

[13] *Haw. Housing Auth. v. Midkiff*, 467 U.S. 229, 240 (1984); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014 (1984).

the police power is the destruction of buildings to prevent the spread of a conflagration."[14]

In Alaska, the State's entry upon private land "for the purpose of preventing, suppressing, or controlling a wildland fire" is explicitly authorized by statute.[15] The legislature further emphasized the public nature of such activities in its enactment of a specific statutory immunity for actions taken while fighting wildfires (discussed below).[16] Implicit in these provisions is the accepted wisdom that fighting wildfires, even on private property, is of benefit to the public as a whole regardless of whether only individual landowners are immediately benefitted. In this case, putting aside the issues of whether the burnouts were set at the right time and in the right place, there is no dispute that they were part of the State's efforts to contain and direct the Railbelt Complex fires. Because the burnouts were set in the exercise of the State's police powers, the damage they caused was for a public use for purposes of the Takings Clause.

We therefore need not reach the landowners' arguments that the public use can be found in alleged State purposes to maximize forage for wildlife or to protect forests that were commercially valuable. And we reject the State's argument that there is no public benefit or use in conducting burnouts on private land to prevent the destruction of private structures.

---

[14] *Northwestern Fertilizing Co. v. Vill. of Hyde Park*, 97 U.S. 659, 669 (1878).

[15] AS 41.15.040.

[16] AS 41.15.045.

- 8 - 6968

On this point, the United States Supreme Court's decision in *Hawaii Housing Authority v. Midkiff*[17] is helpful. One issue was whether the condemnation of private property was for a public use when it was made under a Hawaii law that transferred ownership to other private parties, the long-term lessees, in an effort to break up historic oligarchies. According to the Supreme Court, "[t]he mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose."[18] It quoted its earlier decisions for the propositions that "[i]t is not essential that the entire community, nor even any considerable portion, . . . directly enjoy or participate in any improvement in order [for it] to constitute a public use";[19] and "what in its immediate aspect [is] only a private transaction may . . . be raised by its class or character to a public affair."[20] The Court also noted the great deference courts show to the legislature's determination that certain measures involve a public use.[21]

Here, too, the State's argument that the individual landowners benefitted — and perhaps solely benefitted — from the burnouts on their property does not dilute the evident public purpose of the State's firefighting activity. A similar issue was

---

[17]    467 U.S. at 243-44.

[18]    *Id.*

[19]    *Id.* at 244 (second and third alterations in original) (quoting *Rindge Co. v. Los Angeles Cnty.*, 262 U.S. 700, 707 (1923)) (internal quotation marks omitted).

[20]    *Id.* (alterations in original) (quoting *Block v. Hirsh*, 256 U.S. 135, 155 (1921)) (internal quotation marks omitted).

[21]    *Id. See also Mountain Water Co. v. Mont. Dep't of Pub. Serv. Regulation*, 919 F.2d 593, 599-600 (9th Cir. 1990) (explaining *Hawaii Housing* and noting that "[a] taking satisfies the constitutional public use requirement if it advances a 'conceivable public purpose' and regardless of whether it succeeds in realizing that purpose").

presented in *Town of Gila Bend v. Walled Lake Door Co.*[22] The Arizona Supreme Court considered an argument that a town's contract to construct a water main to a factory building violated a state constitutional provision prohibiting public investment in private corporations. The court rejected the argument, observing in part that "the fact that the Company stands to be directly benefited in the event that a fire should occur at its plant and will be indirectly benefited by reduced fire insurance premiums[] is of absolutely no consequence."[23] The court concluded, "There can be no doubt but that the supplying of water for purposes of preserving and protecting lives and property is a 'public purpose' and one which will provide a direct benefit to the public at large."[24]

We recognize that precedent can lead us in different directions. In *National Board of YMCA v. United States*, the Supreme Court created what came to be known as the "intended beneficiary" rule, by which government action taken primarily to defend private property from damage does not result in a compensable taking.[25] During riots in the Panama Canal Zone, the Army occupied the petitioners' buildings, which were heavily damaged during the fighting that followed.[26] Although the petitioners argued that the Army used their buildings "as part of a general defense of the Zone as a whole,"

---

[22] 490 P.2d 551 (Ariz. 1971).

[23] *Id.* at 555-56.

[24] *Id.* at 556. *See also Concerned Citizens for Responsible Gov't v. W. Pt. Fire Prot. Dist.*, 127 Cal. Rptr. 3d 783, 791 (Cal. App. 2011), *review granted*, 262 P.3d 853 (Cal. 2011) ("Fire suppression, like bus transportation or police protection, is a classic example of a service that confers general benefits on the community as a whole."); *Verizina v. City of Hartford*, 138 A. 145, 146 (Conn. 1927) ("A fire department engaged in extinguishing fires is performing a governmental duty for the general good.").

[25] 395 U.S. 85 (1969).

[26] *Id.* at 87-88.

the Court concluded that "[t]he stipulated record . . . demonstrates that the troops were acting primarily in defense of petitioners' buildings."[27]

Relying on the purpose of the federal Just Compensation Clause — "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole" — the Supreme Court held that the clause did not apply to the petitioners' losses.[28] It acknowledged that "any protection of private property also serves a broader public purpose."[29] But it went on to say that

> where, as here, the private party is the particular intended beneficiary of the governmental activity, 'fairness and justice' do not require that losses which may result from that activity 'be borne by the public as a whole,' even though the activity may also be intended incidentally to benefit the public. Were it otherwise, governmental bodies would be liable under the Just Compensation Clause to property owners every time policemen break down the doors of buildings to foil burglars thought to be inside.[30]

That the petitioners' damage was not directly caused by the government made no difference to the Court's analysis: "[P]etitioners would not have a claim for compensation under the Fifth Amendment even if they could show that damage inflicted by rioters occurred because of the presence of the troops."[31]

---

[27]    *Id.* at 90.

[28]    *Id.* at 89.

[29]    *Id.* at 92.

[30]    *Id.* (citations omitted).

[31]    *Id.* at 89.

We do not believe that *YMCA*'s "intended beneficiary" test adequately reflects the broad protection of Alaska's Takings Clause.[32] A New Jersey appellate court recently identified several of the test's shortcomings, most importantly that it "forces courts to be 'caught up in an identification and evaluation of the primary beneficiary,' when, in reality, 'the intended beneficiary of police activity is always the general public.' "[33] We note further that the danger the Supreme Court identified in recognizing a right to compensation under the Fifth Amendment when a private party is "the particular intended beneficiary of the government activity" — that it would make the government liable to the owners "every time policemen break down the doors of buildings to foil burglars thought to be inside"[34] — ignores the doctrine of necessity, discussed below.

In this case, when the State conducted burnouts on the landowners' properties, it was exercising an essential aspect of its police power. We conclude that this is sufficient to show a public use, whether the burnouts were intended to benefit primarily other State lands, as the landowners allege, or primarily the landowners, as the State alleges.

---

[32] "We liberally interpret Alaska's Takings Clause in favor of property owners, whom it protects more broadly than the federal Takings Clause." *Waiste v. State*, 10 P.3d 1141, 1154 (Alaska 2000); *see also Vanek v. State, Bd. of Fisheries*, 193 P.3d 283, 288 (Alaska 2008) ("The Alaska Constitution contains a broader conception of compensable takings" than the Fifth Amendment of the federal constitution.).

[33] *Simmons v. Loose*, 13 A.3d 366, 389 (N.J. Super. App. Div. 2011) (quoting C. Wayne Owen, Jr., *Everyone Benefits, Everyone Pays: Does the Fifth Amendment Mandate Compensation When Property is Damaged During the Course of Police Activities?*, 9 WM. & MARY BILL RTS. J. 277, 295 (2000)).

[34] *Nat'l Bd. of YMCA*, 395 U.S. at 92.

**2. The burnouts conducted by the State do not constitute a compensable taking if they were justified by the doctrine of necessity.**

Regardless of whether the State damaged the landowners' property for a public use, the landowners have no constitutional right to just compensation if the State's actions were justified by the doctrine of necessity. But given the broad protections of Alaska's Takings Clause, we decline to hold that every valid exercise of the police power is justified by the doctrine of necessity and results in a noncompensable taking.

In granting summary judgment to the State on the takings claims, the superior court found in effect that necessity was implicit in the State's exercise of its police power. The court reasoned that it was pursuant to the State's police power that the legislature enacted AS 41.15.040, the statute granting firefighters access to private property for the purpose of fighting fires,[35] and that the State acted pursuant to this statutory authority when it set burnouts on the landowners' property. The court reasoned: "Wildfire suppression activities such as those authorized by AS 41.15.040 are clear examples of the valid exercise of state police power for the protection of its citizenry and natural resources, and therefore no compensation is due when property is

---

[35]  The statute provides:

> Upon approval by the commissioner or an authorized agent, an employee of the division of lands, or of any organization authorized to prevent, control, or suppress a fire or a destructive agent, and others assisting in the control or suppression of a fire upon request of an officer or employee of the United States or the state may at any time enter upon any land, whether publicly or privately owned, for the purpose of preventing, suppressing, or controlling a wildland fire or a destructive agent.

damaged pursuant to the prevention, suppression, or control of wildland fires." The State essentially adopts the superior court's analysis on this appeal.

Firefighting is undoubtedly an exercise of the State's police power, as we acknowledge above. But we decline to hold that the police power is coextensive with the doctrine of necessity, i.e., that because firefighting is an exercise of the police power, all damage caused during the State's firefighting activities is per se necessary and therefore not compensable under the takings clause. We agree with an observation of a federal claims court: "If the police power exception to just compensation is limited only by the sovereign power of the Government, . . . it becomes the exception which swallows the rule, an intolerable result."[36] In the context of firefighting, as we explain below, the doctrine of necessity requires that there be an imminent danger and an actual emergency giving rise to actual necessity; otherwise, damage may be compensable under the Takings Clause even though it is caused by the State's otherwise valid exercise of the police power.

We have held that "[t]he distinction between eminent domain and the state's police power is well established legal doctrine."[37] Where one ends and the other begins, however, may be difficult to define. Eminent domain is "the right of a government to take and appropriate private property to public use[] whenever the public exigency requires it; which can be done only on condition of providing a reasonable compensation therefor,"[38] whereas the police power may allow the State "consistently with

---

[36] *Morton Thiokol, Inc. v. United States*, 4 Cl. Ct. 625, 630 (1984).

[37] *Waiste v. State*, 10 P.3d 1141, 1155 (Alaska 2000).

[38] *Wernberg v. State*, 516 P.2d 1191, 1195 (Alaska 1973) (quoting *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53, 85 (1851)) (internal quotation marks omitted).

constitutional requirements [to] acquire private property interests in a manner that does not constitute a taking,"[39] i.e., without having to provide reasonable compensation.[40] In *Waiste v. State*, for example, we held that the "government seizure of property suspected of having been used to break the law falls squarely within the police power" and "is not an exercise of the State's constitutional taking power for which the Takings Clause triggers the requirement of just compensation."[41]

But the distinction between eminent domain (compensable) and a valid exercise of the police power (not compensable) is not a sharp one.[42] The United States Supreme Court has repeatedly recognized that there are limits beyond which a state's otherwise valid exercise of its police power may require compensation.[43] Defining those limits in the context of firefighting activities is our immediate task; we do so by reference to the doctrine of necessity, which has a long history in the common law.[44]

---

[39] *Waiste*, 10 P.3d at 1155 (quoting *Hughes v. State*, 838 P.2d 1018, 1037 (Or. 1992)) (internal quotation marks omitted).

[40] *R & Y, Inc. v. Municipality of Anchorage*, 34 P.3d 289, 297-98 (Alaska 2001).

[41] *Waiste*, 10 P.3d at 1155.

[42] *See Penn. Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922) ("[T]his is a question of degree — and therefore cannot be disposed of by general propositions.").

[43] *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1021-28 (1992) (tracing the judicial development of the distinction between compensable takings for public use and attempts to proscribe uses of property without compensation through the police power, and making note of "*Mahon*'s affirmation of limits to the noncompensable exercise of the police power"); *Mahon*, 260 U.S. at 413 ("[O]bviously the implied limitation [of the police power] must have its limits or the contract and due process clauses [of the Constitution] are gone.").

[44] *See generally* Derek T. Muller, *"As Much Upon Tradition As Upon*

(continued...)

Public necessity acts as a defense to property torts such as trespass and conversion and allows a person to enter land and destroy property where there is "[a] necessity that involves the public interest."[45] Public necessity "completely excuses the defendant's liability."[46] While the privilege of public necessity is an individual one, state officials can exercise it.[47] Thus, the state generally does not have to pay compensation where "the destruction or damage was, or reasonably appeared to be, necessary to prevent an impending or imminent public disaster from fire, flood, disease, or riot."[48] Almost all cases that discuss public necessity note that it generally includes the destruction of buildings or land to stop the spread of a fire.[49]

---

[44](...continued)
*Principle": A Critique of the Privilege of Necessity Destruction Under the Fifth Amendment*, 82 NOTRE DAME L. REV. 481 (2006).

[45]    BLACK'S LAW DICTIONARY 1131 (9th ed. 2009).

[46]    *Id.*

[47]    1 JULIUS L. SACKMAN, NICHOLS ON EMINENT DOMAIN §1.43[2] (3d ed. 2014) ("If the individual who enters and destroys private property happens to be a public officer whose duty it is to avert an impending calamity, the rights of the owner of the property to compensation are no greater than in the case of a private individual.")

[48]    *City of Rapid City v. Boland*, 271 N.W.2d 60, 66 (S.D. 1978) (citations omitted).

[49]    *See, e.g.*, *Ralli v. Troop*, 157 U.S. 386, 405 (1895) ("By our law, indeed, either public officers or private persons may raze houses to prevent the spreading of a conflagration. But this right rests on public necessity, and no one is bound to compensate for or to contribute to the loss, unless the town or neighborhood is made liable by express statute."); *Field v. City of Des Moines*, 39 Iowa 575, 577 (1874) ("That any persons may 'raze houses to the ground to prevent the spreading of a conflagration,' without incurring any liability for the loss to the owner of the houses destroyed, is a doctrine well established in the common law."); *Hale v. Lawrence*, 21 N.J.L. 714, 730
(continued...)

When the United States and state constitutions were adopted, courts continued to use public necessity as an implicit exception to the requirement of just compensation.[50] A seminal case is *Bowditch v. City of Boston*, in which the Supreme Court explained the common law roots of the necessity doctrine: "At the common law every one had the right to destroy real and personal property, in cases of actual necessity, to prevent the spreading of a fire, and there was no responsibility on the part of such destroyer, and no remedy for the owner."[51] It went on: "In these cases the common law adopts the principle of the natural law, and finds the right and the justification in the same imperative necessity."[52] Later cases affirmed the common law foundations of the necessity defense under similar circumstances.[53]

---

[49](...continued)
( N.J. 1848) ("[I]n a densely populated town, all may unite in destroying a building to stop a conflagration which threatens destruction to the rest."); *Respublica v. Sparhawk*, 1 U.S. (1 Dall.) 357, 363 (Pa. 1788) ("Houses may be razed to prevent the spreading of fire, because [of] the public good."); *The Case of the King's Prerogative in Saltpetre*, (1606) 77 Eng. Rep. 1294 (K.B.) (analogizing taking saltpeter from a private landowner during wartime to destruction to prevent the spread of fire).

[50]    *See* Muller, *supra* note 44, at 508-10; *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 n.16 (1992) (recognizing that there is no compensable taking when the state's destruction of property is done " 'in cases of actual necessity, to prevent the spreading of a fire' or to forestall other grave threats to the lives and property of others").

[51]    101 U.S. 16, 18 (1879).

[52]    *Id.* at 19.

[53]    *See, e.g.*, *Lucas*, 505 U.S. at 1029 n.16 (citing with approval *Bowditch*, 101 U.S. at 18-19); *United States v. Caltex (Phil.), Inc.*, 344 U.S. 149, 154 (1952) ("[T]he common law ha[s] long recognized that in times of imminent peril — such as when fire threatened a whole community — the sovereign could, with immunity, destroy the
(continued...)

The Federal Circuit recently discussed the necessity doctrine in *TrinCo Investment Co. v. United States*.[54] Wildfires were burning parts of the Shasta-Trinity National Forest in California. The Forest Service intentionally lit fires on and adjacent to TrinCo's properties in order to deprive the fires of fuel, thereby destroying nearly two thousand acres of TrinCo's timber, worth over $6 million. TrinCo sued the United States, alleging a taking, though unlike the landowners here they alleged that the fires would never have reached their property at all were it not for government intervention.[55]

The federal claims court granted the United States' motion to dismiss, reasoning that "the doctrine of necessity absolves the Government from liability for any taking or destruction of property in efforts to fight fires."[56] On appeal, however, the Federal Circuit held that the lower court had "misapprehended the reach of the doctrine of necessity."[57] It held that "extend[ing] the doctrine of necessity to automatically

---

[53](...continued) property of a few that the property of many and the lives of many more could be saved."); *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1377 (Fed. Cir. 2013) ("This principle, absolving the State . . . of liability for the destruction of real and personal property in cases of actual necessity, to prevent . . . or forestall . . . grave threats to the lives and property of others, is commonly referred to as 'the doctrine of necessity' or the 'necessity defense.'" (omissions in original) (internal quotation marks omitted) (quoting *Lucas*, 505 U.S. at 1029 n.16 ); *see also State v. Olsen*, 299 N.W.2d 632, 634 (Wis. App. 1980) (An example of the doctrine of necessity is "[a] person who, seeking to stop the spread of a fire, razes a building in order to save a town." (citing W. LaFave & A. Scott, Jr., Handbook on Criminal Law at 384 (Hornbook Series 1972))).

[54]    722 F.3d at 1377-80.

[55]    *Id.* at 1377.

[56]    *Id.*

[57]    *Id.* at 1378.

absolve the Government's action in any case involving fire control stretches the doctrine too far."[58]

The Federal Circuit found no law directly on point, but it concluded that Supreme Court precedent required "that the doctrine of necessity may be applied only when there is an imminent danger and an actual emergency giving rise to actual necessity."[59] It noted that in *Bowditch*, the City of Boston was not liable when its firefighters demolished a building "at a place of danger in the immediate vicinity [of a fire], to arrest the spreading of the fire," and "the measure . . . stopped the progress of the fire."[60] It noted that in *Caltex*, the United States was not liable for the Army's destruction of privately owned oil facilities in Manila "in the face of their impending seizure by the enemy," where Japanese troops were marching into the city and their planes were bombing the area.[61] It cited another wartime seizure case, *Mitchell v. Harmony*, involving the Army's confiscation and loss of a trader's goods during the war with Mexico:[62] "[F]or a taking to be justified during wartime the 'danger must be immediate and impending' or the 'necessity urgent . . . such as will not admit delay'

---

[58]    *Id.*

[59]    *Id.* (citing *Bowditch v. City of Boston*, 101 U.S. 16, 16-19 (1879); *Ralli v. Troop*, 157 U.S. 386, 405 (1895); *United States v. Caltex (Phil.), Inc.*, 344 U.S. 149, 151-56 (1952); *Mitchell v. Harmony*, 54 U.S. 115, 135 (1851)).

[60]    *Id.* (alterations in original) (quoting *Bowditch*, 101 U.S. at 16) (internal quotation marks omitted).

[61]    *Id.* at 1378-79 (citing *Caltex*, 344 U.S. at 151).

[62]    *Mitchell*, 54 U.S. at 129.

because 'it is the emergency that gives the right [to the Government to take private property], and emergency must be shown to exist before the taking can be justified.' "[63]

Applying the test for necessity that it extrapolated from this case law —"imminent danger and an actual emergency giving rise to actual necessity" — the Federal Circuit reversed the dismissal of TrinCo's takings claim.[64] It noted that the facts as alleged in TrinCo's complaint did not demonstrate "the kind of imminent danger and actual emergency posed by a fire burning in a populated city, as in *Bowditch*, or an invading enemy army, as in *Caltex*."[65] It held that "[i]t is certainly plausible that the Iron Complex fire did not pose an imminent danger or actual emergency necessitating the destruction of such a sizable portion of TrinCo's property," and that discovery could show "why the Plaintiff's property had to be sacrificed, as opposed to other property, including other portions of the National Forest itself."[66] It concluded: "It would be a remarkable thing if the Government is allowed to take a private citizen's property without compensation if it could just as easily solve the problem by taking its own."[67]

We agree with the analysis in *TrinCo*. Here, the superior court considered only whether the State's actions were taken within the context of its general police power. But a taking of private property does not escape application of the Takings Clause simply because it occurs in the course of the State's firefighting activities; to be noncompensable, the taking must be justified by the doctrine of necessity. The doctrine

---

[63]    *TrinCo*, 722 F.3d at 1379 (alteration in original) (quoting *Mitchell*, 54 U.S. at 135).

[64]    *Id.* at 1378, 1380.

[65]    *Id.* at 1380.

[66]    *Id.*

[67]    *Id.*

- 20 -                                                                6968

applies only if the State demonstrates the existence of "imminent danger and an actual emergency giving rise to actual necessity," an inquiry that is fact-specific.[68]

This inquiry should not devolve into an after-the-fact evaluation of the wisdom of the fire-fighting policies and tactical choices that preceded the taking, decisions that in a tort action are immunized by AS 41.15.045. Whether a taking is necessary must be judged at the time the taking occurs. The essence of the doctrine is that the government is acting "under pressure of public necessity and to avert impending peril" and chooses to damage private property as the lesser of two evils.[69] It is that choice, in that moment, for which necessity may provide a defense.

The facts of this case may support applying the doctrine of necessity. But the parties' evidence must be evaluated in the context of whether there was an "imminent danger and an actual emergency giving rise to actual necessity," a task we leave to the superior court in the first instance. We reverse the grant of summary judgment to the State on the landowners' claim under the Takings Clause of the Alaska Constitution and remand it to the superior court for further consideration; but in so doing we do not decide whether the evidence already in the record would preclude another grant of summary judgment for the State.

---

[68]     *See United State v. Caltex (Phil.), Inc.*, 344 U.S. 149, 156 (1952) ("No rigid rules can be laid down to distinguish compensable losses from noncompensable losses. Each case must be judged on its own facts."); *Mitchell*, 54 U.S. at 134 ("It is impossible to define the particular circumstances of danger or necessity in which this power may be lawfully exercised. Every case must depend on its own circumstances.").

[69]     *Customer Co. v. City of Sacramento*, 895 P.2d 900, 910 (Cal. 1995) (quoting *Holtz v. Superior Court*, 475 P.2d 441, 446 (Cal. 1970)).

**B.**    **The Superior Court Did Not Err In Dismissing The Landowners' Tort Claims.**

The landowners argue that the superior court also erred in dismissing their tort claims against the State, but on this issue we affirm the judgment of the superior court, finding the claims barred by statutory immunity.

**1.**    **Alaska Statute 41.15.045, not AS 09.50.250, controls whether the State's firefighting activities are immune from tort liability.**

The superior court conducted a two-step analysis of the State's governmental immunity defense, addressing first the discretionary immunity provided by AS 09.50.250 and then addressing the specific firefighting immunity provided by AS 41.15.045.  We hold that the latter statute controls.[70]

Alaska Statute 09.50.250 precludes tort claims against the State that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused."  We discussed this statute in the context of fighting wildfires in *Angnabooguk v. State*, in which we specifically rejected the State's claim that all such activities were immune as necessarily involving policy choices or some other exercise of discretion.[71]  Focusing on AS 09.50.250, our analysis began with the well-established distinction between planning (that is, discretionary) and operational decisions for purposes of determining whether statutory immunity applies.[72] We noted our consistent holdings that "the State's decision to engage in an activity is an

---

[70]    Because we conclude that only AS 41.15.045 applies, we reject the State's argument that the landowners waived the immunity issue by not appealing from the superior court's holding that the State was also protected by AS 09.50.250.

[71]    *See* 26 P.3d 447, 454-55 (Alaska 2001).

[72]    *See id.* at 455-56.

immune 'planning' decision, while the decisions undertaken in implementing the activity are operational, as long as the implementation does not involve the consideration of policy factors."[73] We noted that "certain on-the-scene firefighting tactical decisions may be considered discretionary because they entail resource allocation decisions or considered decisions of firefighting policy that are properly vested in the officials in charge," and we gave as one example the setting of backfires.[74] On the other hand, we noted that decisions considered operational could include the State's failure to prevent employees from working under the influence of drugs or alcohol, failure to build a firewall, failure to post lookouts during a burnout, and failure to conduct an adequate mop-up.[75] We remanded the case to the superior court for further factual development as to which of the tactical firefighting decisions at issue were operational and which were planning and therefore immune.[76]

Following *Angnabooguk*, the legislature enacted an immunity statute that provides broad tort immunity for firefighting activities without regard to the "planning/operational" distinction drawn in the context of the more general immunity statute, AS 09.50.250. The new statute, AS 41.15.045(a), provides immunity to the State and other governmental entities from any "civil action for damages for death, personal injury, or property damage that results from an act or omission in performing or failing to perform activities or duties arising out of prevention, monitoring, control, or suppression of fires authorized to be performed under AS 41.15.010–41.15.170 [addressing wildland and forest fires]." The new statute's only exception is for actions

---

[73]    *Id.* at 456.

[74]    *Id.* at 459.

[75]    *Id.*

[76]    *Id.*

for damages resulting from "intentional misconduct within the course and scope of employment or agency and with complete disregard for the safety and property of others."[77]

Legislative history shows that AS 41.15.045 was adopted in direct response to our decision in *Angnabooguk* and the law of governmental immunity as we applied it to firefighting activities in that case.[78] The governor's sponsor statement, and his letter transmitting the proposed bill to the legislature, reported that two of this court's 2001 decisions[79] "ruled that the State of Alaska may be sued and held liable for tort claims for losses due to fire suppression efforts" and that "[t]hese decisions open the door to significant financial exposure to the state for losses due to fires."[80] The transmittal letter and sponsor statement stated that "[d]ecisions regarding forest management related to fire control and suppression should be prompted by sound forestry and firefighting principles, rather than concerns regarding possible tort liability," and that "[l]itigation of such claims inherently disrupts the division of forestry's day-to-day operations and

---

[77]     AS 41.15.045(b).

[78]     Sectional Analysis of Committee Substitute for H.B. 245, 23d Leg., 1st Sess., *available at* Alaska Leg. Microfiche Collection No. 10825.

[79]     Besides *Angnabooguk*, the letter apparently refers to *Bartek v. State, Dep't of Natural Res., Div. of Forestry*, 31 P.3d 100, 101 (Alaska 2001), which we observed in *Bartek* was "closely related" to *Angnabooguk* and presented the same immunity issues. Because we decided those issues in *Angnabooguk*, in *Bartek* we decided only issues of class certification. *See also* STATE OF ALASKA, DEP'T OF LAW, OP. ATT'Y GEN., 2003 WL 22718859 (June 2, 2003) at *4 ("These sections are intended to overrule holdings of the Alaska Supreme Court in the cases of *Angnabooguk . . .* and *Bartek . . .* that the State is not immune and may be sued for its firefighting activities.").

[80]     2003 House Journal 782-83.

diverts substantial state resources to defend such lawsuits."[81]  The proposed bill was intended to correct this perceived problem; in a contemporaneous sectional analysis of the bill, the Department of Law observed that the broad firefighting immunity provision was included in order to "override[] the decision of the Alaska Supreme Court in *Angnabooguk* . . . that, because the state legislature had not explicitly made all firefighting activities and decisions immune from suit, both the state and individual firefighters could be held liable for damage caused by a wildfire."[82]

In sum, as we held in *Angnabooguk*, AS 09.50.250 immunizes tactical firefighting activities only to the extent they may be categorized as discretionary planning decisions; it does not immunize firefighting activities that are operational.[83] Alaska Statute 41.15.045, on the other hand, immunizes *all* firefighting activities regardless of the planning/operational distinction, with a limited exception for intentional misconduct.  As the two statutes conflict, we apply the one that is both more specific and later in time — AS 41.15.045, the 2003 law that addresses firefighting activities specifically.[84]

---

[81]    *Id.*

[82]    Sectional Analysis of Committee Substitute for H.B. 245, 23d Leg., 1ˢᵗ Sess., *available at* Alaska Leg. Microfiche Collection No. 10825. *See also* STATE OF ALASKA, DEP'T OF LAW, OP. ATT'Y GEN., 2003 WL 22718859 (June 2, 2003) at *4 (The immunity provisions "reassert the State of Alaska's sovereign immunity from claims arising out of fire fighting and related activities and are intended to immunize the entire class of fire fighting activities, with the limited exception of a civil action for damages as a result of intentional misconduct within the course and scope of employment or agency and with complete disregard for the safety and property of others.").

[83]    26 P.3d 447, 458-59 (Alaska 2001).

[84]    *See Nelson v. Municipality of Anchorage*, 267 P.3d 636, 642 (Alaska 2011) ("If one statutory 'section deals with a subject in general terms and another deals with

(continued...)

**2.    The State's conduct does not fall within the "intentional misconduct" exception of AS 41.15.045(b).**

Focusing on the firefighter immunity statute, the landowners argue that their claims satisfy its exception for "intentional misconduct within the course and scope of employment or agency and with complete disregard for the safety and property of others."[85] The landowners argue that (1) the State acted intentionally in conducting the burnouts on their properties; and (2) burnouts in violation of the State's Full Management Option protection policy — which applies to the landowners' properties under the interagency fire protection plan — constitute misconduct. The Full Management Option protection policy has as its stated objectives (1) to control fires on the designated property "at the smallest acreage reasonably possible on initial attack without compromising fire fighter safety"; (2) to protect the property from the spread of fires "burning in a lower priority management option"; and (3) to minimize damage on the property "commensurate with the values at risk."

The landowners acknowledge that the "Plan was developed to enable appropriate fire suppression decisions 'within the constraints of policy and land management objectives.' " The landowners recognize that the objectives the State faces may be competing ones:  for example, the minimization of burning on properties given Full protection status and the maximization of burning for ecological purposes. The landowners complain, however, that the State made the wrong choice between these

---

[84](...continued)
a part of the same subject in a more detailed way, the two should be harmonized, if possible; but if there is a conflict, the specific section will control over the general.'. . . '[I]f two statutes conflict, then the later in time controls over the earlier.' " (quoting *In re Hutchinson's Estate*, 577 P.2d 1074, 1075 (Alaska 1978); *Allen v. Alaska Oil & Gas Conservation Comm'n*, 147 P.3d 664, 668 (Alaska 2006))).

[85]     AS 41.15.045(b).

objectives: "the State's maximum acreage goal was prioritized and realized to its fullest extent by means of deliberately damaging the Full fire protection properties." Under the landowners' theory, the State's deliberate election of one policy objective over another constitutes misconduct.

As we observed in *Angnabooguk*, "we have consistently held that, for all State activities, the State's decision to engage in an activity is an immune 'planning' decision, while the decisions undertaken in implementing the activity are operational, *as long as the implementation does not involve the consideration of policy factors*."[86] When analyzing cases under AS 09.50.250, we "have recognized that if decisions require the state to balance 'the detailed and competing elements of legislative or executive policy,' they nearly always deserve protection by discretionary function immunity."[87] Furthermore, " '[d]ecisions about how to allocate scarce resources' will ordinarily be immune from judicial review."[88]

The decision on which the landowners base their misconduct argument — allegedly a decision to prioritize a "maximum acreage goal" over the Full protection policy expressed in the interagency fire management plan — inescapably involves both balancing executive policies and allocating limited resources. Under AS 09.50.250, these decisions would be immune as discretionary planning activities. Given that AS 41.15.045 clearly expands the range of firefighting activities for which the State is immune, it would be unreasonable for us to conclude that activities that would be

---

[86] *Angnabooguk v. State, Dep't of Natural Res., Div. of Forestry*, 26 P.3d 447, 456 (Alaska 2001) (emphasis added).

[87] *Guerrero ex rel. Guerrero v. Alaska Hous. Fin. Corp.*, 123 P.3d 966, 977 (Alaska 2005) (quoting *Indus. Indem. Co. v. State*, 669 P.2d 561, 563 (Alaska 1983)).

[88] *Id.* (quoting *Adams v. City of Tenakee Springs*, 963 P.2d 1047, 1051 (Alaska 1998)).

immune under AS 09.50.250 lost their immunity with the enactment of AS 41.50.045 because of the "intentional misconduct" exception. And because the landowners cannot show intentional misconduct, we need not address the other elements of the exception: whether the alleged misconduct occurred "within the course and scope of employment or agency and with complete disregard for the safety and property of others."

## V.    CONCLUSION

We AFFIRM the superior court's dismissal of the landowners' tort claims and REVERSE the dismissal of their claims for just compensation under the Takings Clause of the Alaska Constitution. We REMAND for further proceedings consistent with this opinion.