

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00362-CV

_____

PRESTONWOOD ESTATES WEST HOMEOWNERS ASSOCIATION, BRUCE W. HAMMOND, CATHERINE D. HAMMOND, RACHEL AUBREY BROWN, LOWELL T. JAMES, L. FRANK DEVLIN, MARILYN DEVLIN, JIM ANAGNOSTIS, DAWN ANAGNOSTIS, JEFFREY DANIEL MORRIS, ANGELA ODELL MORRIS, DONALD RORSCHACH, JILL RORSCHACH, JON. P. JACKSON, CHAN KANG, SUNG KANG, ALBERTO E. VAZQUEZ, MARTHA WHELAN, MARY ANN LEVINE, GARY E. DAVIDSON, MARTHA DAVIDSON, JOHN MICHAEL O'SHEA, ROBERT BLAKE, MICHELLE LINDSAY, STEPHEN DEDWYLDER, SIMONE IKONOMIDES, JAMES L. EDDINS, DOLLYE D. EDDINS, ARTHUR HALLFORD, SHEILA HALLFORD, PAUL D. MORRIS, JR., BRENDA MORRIS, KATHERINE ELLIS, WAYNE KAY GUESSFORD, DECEASED AND/OR THE ESTATE OF WAYNE KAY GUESSFIRD, JOHNNY L. STONE, CHRISTY R. STONE, JAMES C. HARRIS, JENNA B. TYLER, GARY L. UPTON, MARTHA J. UPTON, JAMES D. BRACE, DAWN BRACE, SANDEEP GUTTIKONDA, COURTNEY J. GUTTIKONDA, PATRICIA WEST, STEPHEN PETERSON, HEATHER PETERSON, BRETT WARMUS, AND ERIN WARMUS, Appellants

V.

CITY OF ARLINGTON, TEXAS, Appellee

---

On Appeal from the 153rd District Court
Tarrant County, Texas
Trial Court No. 153-319238-20

---

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

2

# MEMORANDUM OPINION

This case arises from Appellee City of Arlington's intentional breach of the Prestonwood Lake Dam and the alleged resulting damage to residential lots along Prestonwood Lake, which is upstream from the dam. Appellants Prestonwood Estates West Homeowners Association and homeowners belonging to the HOA[1] (collectively, the Homeowners) sued the City for inverse condemnation and under the Texas Tort Claims Act (TTCA). They also sought attorney's fees. The City filed a plea to the jurisdiction asserting that governmental immunity protected it from the Homeowners' claims and that the Homeowners had failed to plead sufficient facts affirmatively establishing a waiver of that immunity. The trial court agreed and granted the City's plea. In a single issue, the Homeowners complain that the trial court erred by granting the City's jurisdictional plea because they adequately pleaded their inverse-condemnation claim. We will reverse and remand.

---

[1]Bruce W. Hammond, Catherine D. Hammond, Rachel Aubrey Brown, Lowell T. James, L. Frank Devlin, Marilyn Devlin, Jim Anagnostis, Dawn Anagnostis, Jeffrey Daniel Morris, Angela Odell Morris, Donald Rorschach, Jill Rorschach, Jon. P. Jackson, Chan Kang, Sung Kang, Alberto E. Vazquez, Martha Whelan, Mary Ann Levine, Gary E. Davidson, Martha Davidson, John Michael O'Shea, Robert Blake, Michelle Lindsay, Stephen Dedwylder, Simone Ikonomides, James L. Eddins, Dollye D. Eddins, Arthur Hallford, Sheila Hallford, Paul D. Morris, Jr., Brenda Morris, Katherine Ellis, Wayne Kay Guessford, Deceased and/or the Estate of Wayne Kay Guessford, Johnny L. Stone, Christy R. Stone, James C. Harris, Jenna B. Tyler, Gary L. Upton, Martha J. Upton, James D. Brace, Dawn Brace, Sandeep Guttikonda, Courtney J. Guttikonda, Patricia West, Stephen Peterson, Heather Peterson, Brett Warmus, and Erin Warmus.

# I. Background

The Homeowners alleged in their first amended petition that the HOA, which was established in 1977, consists of about 31 homes along Lakehill Court, Stonebrook Drive, and Lake Country Drive in northwest Arlington. The HOA comprises lots that abut a creek and Prestonwood Lake, which was created when the Prestonwood Lake Dam was installed between 1979 and 1982. The HOA is responsible for maintaining the dam.

The Homeowners further alleged that around the time the City conducted a nearby public-improvement project in the early 1990s, homeowners along the creek began noticing significant silt deposits in the waterway. Since that project, the silting of the lake and creek continued to the point that neither could be used for canoeing or fishing. By 2018, the unabated silting had caused the lake's depth to decrease from its historic maximum of over twenty feet to only three to five feet.

In the fall of 2018, the dam was not in "ideal condition," and Tarrant County was experiencing severe weather and flooding. In late October 2018, the City hired an engineering firm to conduct a breach analysis on the dam to determine the likelihood of the dam's failure and to evaluate any downstream impacts in the event of a breach. The firm's report[2]—which was addressed to Audra Valamides, P.E., an engineer with the City's Stormwater Management Department, and was provided to her on October

---

[2]The Homeowners attached the report to their petition and incorporated it into their pleadings. *See* Tex. R. Civ. P. 59.

4

30, 2018—described the dam's damaged condition and concluded that "the dam will likely fail if no remedial actions are taken immediately."

The report also summarized the firm's breach-analysis methodology and results. According to the report, the breach analysis indicated that

> [t]he downstream roadway, Green Oaks Boulevard, would not be overtopped by a breach. Moving downstream, flow would move around the southwest side of the City of Fort Worth Village Creek Wastewater Treatment Plant, join Village Creek, and then confluence with the West Fork of the Trinity River. No habitable structures were identified in the breach zone. A set of box culverts on the treatment plant site would likely be able to convey breach flows. Based on these findings, a "low hazard" classification for the dam according to [Texas Commission on Environmental Quality] dam safety regulations would be appropriate.

The report went on to summarize additional potential risks of dam failure:

- channel widening that would "likely occur" and "could potentially impact nearby structures";

- erosion that would threaten an upstream street (Lamar Boulevard) and culverts;

- a release of sediment that could potentially impact ecological habitats and City culverts;

- possible additional downstream erosion that could threaten private property, public infrastructure, and the downstream channel; and

- the Homeowners' loss of the lake's "normal pool . . . and associated aesthetic and recreation benefits."

Given the dam's condition and the likely possibility of a dam breach, the report recommended notifying the Texas Commission on Environmental Quality of the dam's condition; alerting City crews to the possible breach and breach flows at Green Oaks Boulevard; inspecting city culverts at Green Oaks Boulevard to ensure that they

were unclogged and able to convey large flows; notifying the Village Creek wastewater treatment plant's operators; checking the conveyance capacity of culverts on the wastewater treatment plant's property; and notifying emergency responders in "the general vicinity and downstream area."

The immediate remedial actions recommended by the report included lowering the lake level, buttressing the left downstream spillway, placing sandbags or stacked ready-mix concrete bags to redirect spillway flows, and removing a tree from the dam's left abutment. Breaching the dam was not among the report's suggested immediate actions. But the report's long-term remedial actions included determining whether the dam should be repaired or be removed, "i.e.[,] decommissioning thru a controlled breach." The report went on to list factors to be considered regarding each long-term remedial action.

On November 1, 2018—two days after the City's mayor received the report—the mayor declared a state of disaster for the City[3] and implemented the City's Emergency Operational Plan[4] because

- the severe weather and flooding that had started on September 10, 2018, had caused and might continue to cause widespread and severe property damage in Tarrant County;

---

[3]The Homeowners also attached the mayor's local disaster declaration to their petition and incorporated it into their pleadings. *See id.*

[4]The Homeowners did not attach the emergency operational plan itself to its pleadings nor did they discuss it in their pleadings.

6

- the Texas Governor had declared a state of disaster for Tarrant County;

- due to the rain occurring within the City over several weeks and still occurring the week of November 1, 2018, the imminent possibility existed that City residents and the City itself would suffer severe injury and property damage due to the possibility of a dam breach on Prestonwood Lake; and

- the mayor had "determined that extraordinary measures must be taken to alleviate the potential suffering of people and to protect or rehabilitate property."

That same day, City crews used a piece of motor-driven equipment to breach the dam.

The Homeowners pleaded that the dam breach caused substantial erosion throughout the waterway's length and that nearly every lot along Prestonwood Lake suffered substantial erosion, which caused retaining walls to crumble and fall into the almost-dry creek bed. They further claimed that some of the Homeowners face the potential of losing the structural integrity of their homes and that "[o]ne lot is mere feet away from losing its underground pool due to the erosion." The Homeowners estimate that the City's actions caused about $2,000,000 in damages.

Nearly two years after the dam breach, the Homeowners sued the City for inverse condemnation under Article I, Section 17 of the Texas Constitution, for property damage under the TTCA, and for attorney's fees. *See* Tex. Const. art. I, § 17(a); Tex. Civ. Prac. & Rem. Code Ann. § 101.021.

The City filed a plea to the jurisdiction attacking the Homeowners' pleadings, arguing that all the Homeowners' claims should be dismissed for lack of subject-matter jurisdiction because the Homeowners had not pleaded and could not establish

facts to support (1) a valid inverse-condemnation claim that would result in a waiver of the City's governmental immunity, (2) an immunity waiver under the TTCA, and (3) an immunity waiver for their attorney's-fees claim. The trial court granted the plea in its entirety.

The Homeowners have appealed, but they do not challenge the trial court's dismissal of their TTCA and attorney's-fees claims. We thus address only whether the trial court erred by granting the City's jurisdictional plea as to the Homeowners' inverse-condemnation claim.

## II. Standard of Review

Unless the state consents to suit, sovereign immunity deprives a trial court of subject-matter jurisdiction over lawsuits against the state or certain governmental units. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004) (op. on reh'g). Cities are political subdivisions of the state and, absent waiver, are similarly entitled to governmental immunity. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006) (op. on reh'g).

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject-matter jurisdiction. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). A jurisdictional plea's purpose is to defeat a cause of action without regard to the asserted claims' merits. *Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). Whether the trial court has subject-matter jurisdiction is a legal question that we review de novo. *Miranda*, 133 S.W.3d at 226.

8

A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both. *Alamo Heights ISD v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). When, as here, the plea challenges the pleadings, we determine if the plaintiffs have alleged facts affirmatively demonstrating subject-matter jurisdiction. *See Miranda*, 133 S.W.3d at 226. We look to the plaintiff's pleadings, construing them liberally in the plaintiffs' favor and looking to the pleaders' intent. *Id.* If the pleadings lack sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable jurisdictional defects, the issue is one of pleading sufficiency, and the plaintiffs should be given the opportunity to amend. *Id.* at 226–27. But if the pleadings affirmatively negate the existence of jurisdiction, then a jurisdictional plea may be granted without allowing the plaintiffs the opportunity to amend. *Id.* at 227.

### III. Inverse Condemnation

Inverse-condemnation claims,[5] also referred to as "takings" claims, are rooted in the takings clause of the Texas Constitution—Article I, Section 17—which provides, in pertinent part, that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." Tex. Const. art. I, § 17(a); *see Tarrant Reg'l*

---

[5]The action is referred to as inverse because the property owner initiates a action to recover compensation for a taking that has already occurred instead of the government's initiating a formal statutory proceeding to determine appropriate compensation for a prospective taking. *See City of Dallas v. Stewart*, 361 S.W.3d 562, 567 (Tex. 2012) (op. on reh'g).

*Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004) ("A physical taking may occur when the government physically appropriates or invades private property, or unreasonably interferes with the landowner's right to use and enjoy it. When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation." (citation omitted)); *City of Dallas v. Jennings*, 142 S.W.3d 310, 313 n.2 (Tex. 2004) (noting that "taking," "damaging," and "destruction" of one's property are three distinct claims arising under Article I, Section 17, but the term "taking" has become used as shorthand to refer to all three types of claims). This constitutional provision waives governmental immunity for takings claims. *See El Dorado Land Co., L.P. v. City of McKinney*, 395 S.W.3d 798, 801 (Tex. 2013); *see also Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980) ("The Constitution itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity for the taking, damaging or destruction of property for public use.").

Even so, a city retains its immunity when a plaintiff fails to allege a valid takings claim. *See, e.g.*, *City of Justin v. Wesolak*, No. 02-15-00379-CV, 2016 WL 2989568, at *4 (Tex. App.—Fort Worth May 19, 2016, no pet.) (mem. op.). To plead a valid takings claim, a plaintiff must plead that (1) the governmental entity intentionally performed certain acts in the exercise of its lawful authority; (2) that such acts resulted in taking, damaging, or destroying the plaintiff's property; and (3) that the taking was

10

for public use. *See, e.g., id.* (citing *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001)).

## IV. Analysis

Here, the City argued in its jurisdictional plea that the Homeowners had failed to plead and cannot establish facts to support a viable takings claim because (1) the City's breaching the dam was an exercise of its police and emergency powers under the "doctrine of necessity" and was thus not a taking for public use under the City's eminent-domain authority; (2) the City lacked the requisite intent; and (3) the City's actions did not proximately cause the Homeowners' damages. In their sole issue, the Homeowners argue that the trial court erred by granting the City's jurisdictional plea because they alleged sufficient facts to plead a viable takings claim. We address each of the challenged elements in turn.

## A. The Doctrine of Necessity

According to the City, the necessity doctrine insulates the City from takings liability here. The Homeowners counter that there is no emergency exception to the takings clause and that the trial court thus erred to the extent that it granted the City's jurisdictional plea based on the mayor's exercising his emergency powers and his issuing the emergency order. The City disagrees and asserts that the threshold question here is whether the City's performing a controlled breach of the dam in response to the mayor's emergency declaration was a use of the City's eminent-domain power—which is compensable under the Texas Constitution—or "an

11

exercise of a narrow set of governmental powers sometimes referred to as the 'doctrine of necessity,' which allows the government to damage or destroy property in extraordinary circumstances without paying compensation." The City additionally argues that the mayor's ordering the controlled breach was an exercise of his emergency police powers authorized by the Texas Disaster Act of 1975, not the City's use of its eminent-domain power. *See generally* Tex. Gov't Code Ann. §§ 418.001, .002, .101–.1102. Thus, the City contends, its "actions were undertaken under the doctrine of necessity in order to prevent the damage likely to occur due to the imminent uncontrolled rupturing of the dam," and therefore, "the takings clause is simply not applicable in this situation."

The City explains that "[t]he 'doctrine of necessity' is a *defense* that can be raised in response to a takings claim for property damage from events related to natural disasters like wildfires and floods, and for police tactics that destroy or damage property to apprehend suspected criminals." [Emphasis added.] *See generally* Shelley Ross Saxer, *Paying for Disasters*, 68 U. Kan. L. Rev. 413, 451–54 (2020) (discussing the doctrine of necessity as a defense to a takings claim). The Texas Supreme Court has also indicated that the necessity doctrine is defensive in nature. In *Steele v. City of Houston*, the Houston Police Department—while attempting to apprehend escaped convicts who had taken refuge in a house—"discharged incendiary material" into the house and destroyed it and its contents. 603 S.W.2d at 788–89. Steele (the property

owner) and the tenants who were living in the home at the time[6] sued the City of

Houston asserting that the destruction of the home and their personal property

entitled them to compensation under the Texas Constitution's takings clause. *See id.* at

788–89.

The supreme court held that Steele and the tenants had pleaded sufficient facts

to allege a compensable claim under the takings clause, reasoning that the

> claim was made under the authority of the Constitution and was not
> grounded upon proof of either a tort or a nuisance. It was a claim for the
> destruction of property, and governmental immunity does not shield the
> City of Houston. The Constitution itself is the authorization for
> compensation for the destruction of property and is a waiver of
> governmental immunity for the taking, damaging or destruction of
> property for public use.
>
> We accordingly reverse the judgments of the courts below.
> Plaintiffs, upon remand, will be entitled to make proof that the City of
> Houston, acting through its officers with authority or color of authority,
> intentionally set the house on fire or that the City prevented the fire's
> extinguishment after it was set. They must also prove that the
> destruction was done "for or applied to public use." That is the factor
> which distinguishes a negligence action from one under the constitution
> for destruction. That the destruction was done for the public use is or
> can be established by proof that the City ordered the destruction of the
> property because of real or supposed public emergency to apprehend
> armed and dangerous men who had taken refuge in the house.

*Id.* at 791–92 (citation omitted).

The court observed that the law had "moved beyond the earlier notion that the

government's duty to pay for taking property rights is excused by labeling the taking

---

[6]The tenants were not at home when police officers set it ablaze. *Steele*,
603 S.W.2d at 789.

as an exercise of the police powers." *Id.* at 789. But, the court noted, the City of Houston could

> *defend* its actions by *proof* of a great public necessity. Mere convenience will not suffice. Uncompensated destruction of property has been occasionally justified by reason of war, riot, pestilence[,] or other great public calamity. Destruction has been permitted in instances in which the building is adjacent to a burning building or in the line of fire and destined to destruction anyway.

*Id.* at 792 (emphases added) (citation omitted). The court went on to explain what Professor William L. Prosser had said "concerning the *defense*" and stated that "[t]he scant proof made by the City of Houston in this case does not establish as a matter of law that it is excused from making compensation for the destruction of plaintiffs' dwelling and personal property." *Id.* (emphasis added) (citing William L. Prosser, *The Law of Torts*, § 24 (4th ed. 1971)).

Federal courts have also recognized that the necessity doctrine is a defense to liability. *See, e.g.*, *Milton v. United States*, 36 F.4th 1154, 1162 (Fed. Cir. 2022); *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1379–80 (Fed. Cir. 2013) (citing *Steele*); *In re Upstream Addicks & Barker (Tex.) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 263–64 (2019).

Here, the Homeowners pleaded sufficient facts to establish that the City's deliberately breaching the dam was done for public use because the mayor had determined (1) that because of the fall 2018 rains, the imminent possibility existed that City residents and the City itself would suffer severe injury and property damage due to the dam's possible failure and (2) that "extraordinary measures must be taken to

14

alleviate the potential suffering of people and to protect or rehabilitate property."[7] *See Steele*, 603 S.W.2d at 792; *see also San Jacinto River Auth. v. Burney*, 570 S.W.3d 820, 837 (Tex. App.—Houston [1st Dist.] 2018) ("A taking is for public use if it is necessary to advance or achieve the intended public use."), *aff'd sub nom. San Jacinto River Auth. v. Medina*, 627 S.W.3d 618 (Tex. 2021). Although the City used the correct procedural vehicle to attack the sufficiency of the Homeowners' pleadings, it was improper for the City to raise the necessity doctrine in its jurisdiction plea because—based on *Steele* and the City's own admission—it is a defense that the City must prove.[8] *Cf. State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009) (noting that immunity from liability is an affirmative defense that cannot be raised by a jurisdictional plea); *Schmitz v. Denton Cnty. Cowboy Church*, 550 S.W.3d 342, 361 n.22 (Tex. App.—Fort Worth 2018, pet. denied) (mem. op. on reh'g) (noting that "limitations is not an appropriate subject of a plea to the jurisdiction because it is an affirmative defense, not a jurisdictional infirmity"). We thus conclude and hold that the trial court erred to the

---

[7]The Homeowners dispute whether there were emergency conditions at the time of the breach. The Homeowners pleaded that the City "took steps to breach the dam under the mistaken notion that there was an emergency condition" and pointed to the engineering report's breach analysis as evidence that there was no emergency. The Homeowners thus contended that the "emergency conditions" claimed by the City cannot "serve to shield the City from the resulting harm of [its] actions." We need not determine whether the City correctly assessed the situation.

[8]At this juncture, we need not determine whether the Texas Supreme Court still recognizes the necessity doctrine as a defense to a takings claim (*Steele* was decided in 1980), the doctrine's contours, or its application to these facts. We similarly do not need to address the application of the Texas Disaster Act of 1975.

extent that it granted the plea to the jurisdiction on this ground. We thus sustain this part of the Homeowners' single issue.

## B. Intent and Causation

The Homeowners maintain that the City's deliberately breaching the dam was an intentional act that resulted in damage to their property for public use. The City contends that the Homeowners failed to plead sufficient facts to demonstrate that the City intended to damage their property or that the City's actions proximately caused those damages. We address each element in turn.

Regarding intent in the takings context, the Texas Supreme Court has explained that

> the government's "mere negligence which eventually contributes to the destruction of property is not a taking"; rather, the government must act intentionally. This requirement is rooted in the constitutional provision that a compensable taking occurs "only if property is damaged or appropriated for or applied to public use." An accidental destruction of property does not benefit the public. The public-use limitation "is the factor which distinguishes a negligence action from one under the constitution for destruction."
>
> For purposes of article I, section 17, a governmental entity acts intentionally if it knows either "that a specific act [was] causing identifiable harm" or "that the specific property damage [was] substantially certain to result from" the act. A governmental entity is substantially certain that its actions will damage property only when the damage is "necessarily an incident to, or necessarily a consequential result of the [entity's] action." The government's knowledge must be determined as of the time it acted, not with benefit of hindsight.

*City of San Antonio v. Pollock*, 284 S.W.3d 809, 820–21 (Tex. 2009) (footnotes omitted).

Here, the Homeowners pleaded that on November 1, 2018, the City's mayor issued an emergency order—the local-disaster declaration—and City crews used an excavator to breach the dam that same day. The Homeowners further pleaded that "the results of the City's actions have been nothing short of devasting for the residents along the waterway." These results include substantial erosion throughout the length of the waterway and on nearly every lot, crumbling retaining walls that have fallen into the almost-dry creek bed, and some Homeowners facing the potential of losing the structural integrity of their homes and in-ground pools. According to the Homeowners, "estimates for the damage caused by the City conservatively total around $2,000,000."

The Homeowners additionally pleaded that two of the Homeowners—Stephen Dedwylder and Bruce Hammond—met with Valamides and another City representative in February 2020 to discuss the City's request to access the lakebed to inspect the stormwater infrastructure along the waterway. During this meeting, the City's breaching the dam and the resulting harm was also discussed. When Dedwylder asked Valamides about the engineering report and why the City "acted in contravention of the recommendations," Valamides responded that she "didn't make the decision" but was involved in the discussions. According to the Homeowners, when Valamides was asked "if the [City] was aware of the harm to upstream properties that breaching the dam would cause, Valamides replied 'Yes.'"

The City counters that the Homeowners cannot rely on a lower-level city employee's statements to establish the City's intent because the Homeowners alleged no facts linking the employee's purported knowledge to the Mayor, city council, or any final policymaker for the City. But according to the Homeowners' pleadings, Valamides—an engineer with the City's Stormwater Management Department—was involved in the discussions regarding the dam breach, and she confirmed that *the City* was aware that the upstream properties would be damaged. Construing the pleadings liberally in the Homeowners' favor and looking to the Homeowners' intent as we must, we conclude that based on the pleadings, the Homeowners have pleaded sufficient facts to allege that when the City intentionally breached the dam, it knew that the damage to the Homeowners' property was substantially certain to result from that act.[9] We therefore sustain this part of the Homeowners' only issue.

Turning to proximate cause, a takings claimant must plead and prove that the government's intentional acts were the proximate cause of the taking or damaging of the property. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 483–84 (Tex. 2012); *see also State v. Hale*, 146 S.W.2d 731, 736 (Tex. 1941) (noting that "true test" for

---

[9]The City also claims that "an assertion of negligence is at the heart of [the Homeowners'] complaint" because the Homeowners pleaded that the City deliberately breached the dam "under the mistaken notion" that there was an emergency. Thus, the City argues, it was merely negligent. But even if the City was wrong about the existence of an emergency, the Homeowners pleaded that the City intentionally breached the dam knowing that damage to the Homeowners' property was substantially certain to result.

a takings claim is whether a governmental entity "intentionally perform[ed] certain acts in the exercise of its lawful authority . . . which resulted in the taking or damaging of plaintiffs' property, and which acts were the proximate cause of the taking or damaging of such property"). Proximate cause comprises cause in fact and foreseeability, and cause in fact "means that the act or omission was a substantial factor in bringing about the injury, *without which the harm would not have occurred.*" *Brandywood Hous., Ltd. v. Tex. Dep't of Transp.*, 74 S.W.3d 421, 426 (Tex. App.— Houston [1st Dist.] 2001, pet. denied) (citing *Doe v. Boys Club of Greater Dall., Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)).

Here, even construing the pleadings liberally in the Homeowners' favor and looking to the Homeowners' intent, we cannot conclude that they have pleaded sufficient facts to allege that the City's deliberately breaching the dam was the cause in fact of their damages. The Homeowners conceded that the dam was not in "ideal condition" at the time of the breach and admitted that the engineering firm had concluded that the dam would likely fail if no remedial actions were immediately taken. So while the Homeowners have pleaded sufficient facts to allege that the City's actions were a substantial factor in bringing about the damage to their property, they have not pleaded that the damage would not have occurred had the City not breached the dam. *See Burney*, 570 S.W.3d at 836 (concluding that pleadings sufficed to allege a takings claim where plaintiffs alleged that "their property was damaged when the flooding reached their property, and it would not have flooded but for the water

19

released by the River Authority," that "their property would not have flooded under natural conditions," and that "the flooding they experienced was far worse than it would have been under natural conditions"); *see also Gragg*, 151 S.W.3d at 554 (explaining that "[i]t was not enough" for a takings claimant "to trace the damaging flooding back to releases from the dam," and that he "was required to prove that the same damaging floods would not have occurred under the same heavy rainfall conditions had the dam not been constructed," which was a fact issue). We thus overrule this part of the Homeowners' single issue.

## C. Opportunity to replead

In their brief, the Homeowners request—as they did at the conclusion of their response to the City's jurisdictional plea in the trial court—the opportunity to amend their pleadings if we conclude that they are deficient. If the pleadings lack sufficient facts to affirmatively demonstrate the trial court's jurisdiction (as here) but do not affirmatively demonstrate incurable jurisdictional defects, the issue is one of pleading sufficiency, and the Homeowners should be afforded the opportunity to amend. *See Miranda*, 133 S.W.3d at 226–27. But if a pleading defect cannot be cured, remand for amendment would serve no legitimate purpose and, thus, should not be allowed. *See Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 839–40 (Tex. 2007).

Here, although the Homeowners pleadings are defective because they have failed to plead sufficient facts to show that the City's deliberately breaching the dam was the cause in fact of the Homeowners' damages, their pleadings do not

20

affirmatively negate this element. *See Miranda*, 133 S.W.3d at 226–27. The issue here is one of pleading sufficiency, not of jurisdictional impossibility. *See id.* Accordingly, the Homeowners should be allowed the opportunity to amend their pleadings to cure this jurisdictional defect.[10] *See id.*; *see also Koseoglu*, 233 S.W.3d at 839 (stating that a plaintiff deserves "a reasonable opportunity to amend" unless the pleadings affirmatively negate the existence of jurisdiction (quoting *Sykes*, 136 S.W.3d at 639)).

## V. Conclusion

With the exception of cause in fact, we conclude that the Homeowners have pleaded sufficient facts to support an inverse-condemnation claim under the Texas Constitution. We thus reverse the trial court's order granting the City's plea to the jurisdiction on the Homeowners' inverse-condemnation claim and remand the case to the trial court to allow the Homeowners the opportunity to replead and for further

---

[10]The City asserts that the Homeowners should not be allowed to replead because they already had an opportunity to do so in the trial court. The jurisdictional plea giving rise to this appeal was the City's second jurisdictional plea. The City's first plea, which the trial court never considered or ruled on, generally challenged the sufficiency of the pleadings supporting the Homeowners' inverse-condemnation claim—"Plaintiffs have not pleaded and cannot establish facts to support a valid inverse[-]condemnation claim which would result in a waiver of immunity"—but lacked the specificity of the City's second plea. After the City filed its first plea, the Homeowners amended their pleadings, and in response, the City filed its second, more detailed jurisdictional plea along with a brief in support containing the jurisdictional challenges discussed above. Under these facts and because the pleadings do not affirmatively negate jurisdiction, we conclude that the Homeowners should be afforded the opportunity to replead. *See Koseoglu*, 233 S.W.3d at 839–40 (suggesting that a plaintiff should be given a reasonable opportunity to replead after a trial court finds merit in a plea to the jurisdiction if the defects can be cured).

proceedings consistent with this opinion. We affirm the rest of the trial court's order granting the City's jurisdictional plea.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: August 4, 2022